**2019 UT App 100**

# THE UTAH COURT OF APPEALS

AHMED D. HUSSEIN,
Appellant,
*v.*
UBS BANK USA,
Appellee.

Opinion
No. 20170709-CA
Filed June 6, 2019

Third District Court, Salt Lake Department
The Honorable Robert P. Faust
No. 150907967

Matthew R. Lewis, Stephen E. Morrissey, Kemper P.
Diehl, and Bryan J.E. Caforio, Attorneys
for Appellant

Stephen P. Horvat, David L. Goldberg, Zachary
Denver, Christian T. Kemnitz, and David Luger,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and DAVID N.
MORTENSEN concurred.

ORME, Judge:

¶1     Ahmed D. Hussein appeals the district court's grant of
summary judgment in favor of UBS Bank USA. We affirm and
remand for the determination of attorney fees reasonably
incurred by UBS Bank on appeal.

## BACKGROUND[1]

¶2     Hussein is an investor who worked as a broker for major brokerage firms in the United States for 15 years before moving to Egypt in 1996 to pursue his own investment opportunities. Until July 2012, he was a director and the second-largest shareholder of Quality Systems, Inc. (QSI), owning 15.7% of the company—an interest "worth hundreds of millions of dollars."

¶3     In 2009, Hussein developed a relationship with a financial advisor (Financial Advisor) from UBS Financial Services, Inc. (UBS-FS), a brokerage firm and UBS subsidiary.[2] To maintain a relationship with Financial Advisor and receive financial and investment services from UBS-FS, Hussein signed a Client Relationship Agreement (CRA), which governed his relationship with UBS-FS in connection with anticipated margin loans[3] between Hussein and UBS Bank.

---

1. "In reviewing a district court's grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party and recite the facts accordingly." *Ockey v. Club Jam*, 2014 UT App 126, ¶ 2 n.2, 328 P.3d 880 (quotation simplified).

2. UBS AG, a global bank headquartered in Zurich, Switzerland, is the parent company of both UBS Bank and UBS-FS.

3. Margin loans allow investors to borrow against the value of securities that they already own. *Margin Loans*, Fidelity, https://www.fidelity.com/trading/marginloans/overview [https://perma.cc/HE5V-9CPE]. "Investors generally use margin to increase their purchasing power so that they can own more stock without fully paying for it." U.S. Sec. & Exch. Comm'n, *Margin: Borrowing Money to Pay for Stocks* (Apr. 17, 2009), https://

(continued…)

*The Loan Agreements*

¶4      In 2009 and 2010, UBS Bank extended two margin loans to Hussein totaling $35.5 million. Hussein secured the loans with 1.3 million shares of QSI stock, then valued at $77 million, and $5 million in diversified assets, but he also pledged his other UBS-FS accounts as collateral.[4] Without the assistance of legal counsel, Hussein negotiated the terms of the loans and reviewed the loan documentation (the Loan Agreements), which granted UBS Bank the rights to call in the loans at any time and, upon the occurrence of certain events, to liquidate Hussein's collateral.[5]

---

(…continued)
www.sec.gov/reportspubs/investor-publications/investorpubs marginhtm.html [https://perma.cc/QZ64-K78P].

4. Hussein granted UBS Bank "a first priority lien and security interest" in "any and all accounts of the Borrower at the Bank or any of its affiliates" and "each Collateral Account," defined as "individually and collectively, each account of the Borrower or Pledgor at [UBS-FS] . . . that is either identified as a Collateral Account on the Application to which this Agreement is attached or subsequently identified as a Collateral Account by the Borrower or Pledgor."

5. In securities-based lending, a margin account is opened when a customer borrows funds from a firm or bank to pay for a portion of the purchase price for securities. The customer's portion of the purchase price and the initial equity in the account are called margin. *See Purchasing on Margin, Risks Involved with Trading in a Margin Account*, Financial Industry Regulation Authority, http://www.finra.org/investors/purchasing-margin-risks-involved-trading-margin-account [https://perma.cc/79NU-ZA8A]. Maintenance margin requirements establish the

(continued…)

¶5 In particular, UBS Bank could "demand full or partial payment of the credit line obligations, at its sole option and discretion without cause, at any time." And if UBS Bank "otherwise deems itself or its security interest in the Collateral insecure, . . . then the Credit Line Obligations will become immediately due and payable (without demand) and the Bank may, in its sole and absolute discretion, liquidate, withdraw or sell all or any part of the Collateral." If the collateral "decline[s] speedily in value" or "customarily is sold on a recognized exchange or market," then UBS Bank had the right to sell the collateral and to do so without "prior notice" to Hussein.

¶6 The Loan Agreements also disclosed that UBS Bank and its affiliates were creditors whose "interests may be inconsistent with, and potentially adverse to, [Hussein's] interests." Furthermore, UBS-FS would "comply with entitlement orders originated by [UBS] Bank" without consent from Hussein, and if UBS Bank asserted control over the collateral, UBS-FS would

---

(…continued)

minimum equity that must be maintained by the customer in a margin account. *Maintenance Margin*, Investopedia, https://www.investopedia.com/terms/m/maintenancemargin.asp [https://perma.cc/Y2J9-EGTX]. "If the equity in a margin account falls below the maintenance margin, the broker will issue a margin call, which requires that the [customer] deposit more cash into the margin account to bring the level of funds up to the maintenance margin, or liquidate securities in order to fulfill the maintenance amount." *Id.* Hussein's loans were subject to a 50% margin maintenance level. Therefore, if the value of his collateralized securities fell below the 50% equity level that he was required to maintain, a margin call could be triggered and he would have to provide additional funds or liquidate some of his securities to cover the equity shortfall.

have to comply with UBS Bank's entitlement orders even if in conflict with Hussein's instructions.

¶7    Separately, UBS Bank and UBS-FS had an agreement (the Servicing Agreement) whereby UBS Bank would offer margin loans to UBS-FS's clients "to be collateralized by [UBS-FS] securities accounts and the securities, financial assets and other investment property . . . in which a security interest has been granted to the Bank by the Borrower." UBS Bank would then have "ultimate control over all entitlement orders and other instructions . . . made with respect to the Accounts," and UBS-FS would have to "comply with all instructions given by [UBS] Bank without further consent by any Borrower or Pledgor."

¶8    After issuing the loans, UBS Bank sent a letter to Hussein, stating that Financial Advisor could answer any questions about his credit line. And until 2012, Hussein's only interactions regarding the loans were with UBS-FS employees—not UBS Bank itself.

¶9    Meanwhile, Hussein also opened two Portfolio Management Program accounts (the PMP Accounts) with UBS-FS that held $8.7 million in assets. Financial Advisor also suggested a Prepaid Variable Forward (PVF), a financial product aimed at helping Hussein obtain liquidity from his substantial stock holdings in QSI and as an eventual replacement for the loans. Discussions on the PVF proposal continued between Hussein and UBS-FS employees until July 25, 2012, but a PVF was never finalized.

*The Liquidation*

¶10    By July 2012, QSI's stock price had substantially declined, eroding the value of Hussein's collateral for the loans. On Saturday, July 21, 2012, Financial Advisor informed Hussein that

"[u]nfortunately, with the stock closing at $23.41 we are looking at a [margin] call on Monday" and that Hussein needed to deliver $600,000 in cash or additional collateral in order to prevent such action. He also informed Hussein that selling from the PMP Accounts "would not give us much coverage" and that UBS Bank was "insisting we first sell [the QSI] shares (about 25,000 shares), or bring in cash or additional Collateral that is not [QSI shares]."

¶11 Hussein told Financial Advisor that he did not want UBS-FS to sell the QSI shares because of an ongoing proxy contest[6] and that he needed time to acquire cash to cover the margin call. He directed Financial Advisor to sell from the PMP Accounts before selling the QSI shares.

¶12 For a period of five days, UBS Bank and UBS-FS did not touch the QSI shares, yet Hussein did not provide any cash or additional collateral to cover the equity shortfall in the account. On July 26, 2012, QSI stock continued to decline, reducing the value of the collateral by $23 million. UBS Bank started liquidating Hussein's QSI shares. After five days, UBS Bank had sold approximately 2,276,756 shares.[7]

---

6. A proxy contest is a battle for the control of a corporation where "a group of shareholders join forces and gather enough shareholder proxies to win a corporate vote." *Proxy Fight*, Investopedia, https://www.investopedia.com/terms/p/proxyfight.asp [https://perma.cc/7V5Y-T4HG].

7. A total of 1.3 million QSI shares were initially pledged as collateral. UBS Bank asserts that Hussein "pledged over $100 million in [QSI] stock and other collateral to UBS Bank" to secure repayment for the loans. In deposition testimony, a UBS Bank officer stated that 2.6 million QSI shares secured the UBS Bank

(continued…)

¶13    Hussein lost the proxy fight and a substantial percentage of his QSI shares. He eventually filed suit against UBS Bank in an effort to recover his losses.

*The District Court's Decision*

¶14    Hussein asserted six causes of action against UBS Bank in the course of alleging that UBS Bank fraudulently induced him to enter into the loans, breached its contractual duties when it liquidated his QSI shares, and violated fiduciary duties it owed to him.

¶15    Following discovery, and relying in large part on the governing documents, UBS Bank moved for summary judgment, arguing that it "acted within the scope of its contractual rights when it liquidated certain collateral that secured $35.5 million in loans that Hussein had received from UBS Bank, and did not breach any financial duties in that regard." Hussein responded by arguing that UBS-FS gave him "bad investment advice" as UBS Bank's agent and that UBS Bank wrongfully liquidated his QSI shares.

¶16    The district court granted UBS Bank's motion, concluding that there were no genuine issues of material fact because UBS-FS did not render financial advice to Hussein as UBS Bank's agent. It also concluded that UBS Bank "acted pursuant to its clear and indisputable rights under the Loan Agreements" "to

_____

(…continued)

loans. Yet these additional pledged shares are not acknowledged in the loan documentation provided in the record. Given that Hussein does not challenge UBS Bank's security interest in the additional QSI shares, we assume that those shares were either collateralized or held in UBS-FS accounts and subject to the terms of the Loan Agreements.

'liquidate any part of the Collateral' without notice to Hussein." Because the Loan Agreements contained an expansive indemnification provision, the district court awarded UBS Bank its costs and attorney fees.

¶17 Hussein appeals.

ISSUES AND STANDARDS OF REVIEW

¶18 Hussein raises two issues on appeal.[8] First, he contends that the district court improperly granted UBS Bank's motion for summary judgment because there were genuine disputes of material fact concerning each of his claims against UBS Bank. Summary judgment is proper when "the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). We review a district court's decision to grant or deny summary judgment for correctness, "view[ing] the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (quotation simplified).

¶19 Hussein also contends that the district court erred in awarding UBS Bank attorney fees. "Whether attorney fees are recoverable in an action is a question of law, which we review for correctness." *Valcarce v. Fitzgerald*, 961 P.2d 305, 315 (Utah 1998).

---

8. Hussein raises a third issue, arguing that the district court erred in granting UBS Bank's motion to strike his jury demand. Because we affirm the district court's grant of summary judgment, this issue is moot and we do not address it further.

ANALYSIS

I. Summary Judgment

¶20    Hussein challenges the district court's grant of UBS Bank's motion for summary judgment on his claims for fraud, constructive fraud, breach of fiduciary duty, breach of contract, tortious interference with contract, and aiding and abetting a breach of fiduciary duty. Essentially, Hussein asserts two theories of liability on the part of UBS Bank. He first contends that UBS Bank induced him into taking out the loans by failing to disclose material facts and to provide investment advice that would have protected him from a margin call (referred to in the briefing as the Advisory Claims). Second, Hussein contends that UBS Bank wrongfully liquidated his QSI shares, breaching the Loan Agreements and the CRA (referred to in the briefing as the Liquidation Claims).

A.    The Advisory Claims

¶21    Hussein argues that UBS Bank failed to disclose material facts to him. He also argues that UBS Bank owed him fiduciary duties through its agent, UBS-FS. These assertions are the grounds for his breach of fiduciary duty, fraud, and constructive fraud claims.

¶22    On these claims, the district court concluded that UBS Bank disclosed the potentially adverse relationship UBS Bank and UBS-FS could have with Hussein. The court also concluded that there was no existence of a confidential relationship between UBS Bank and Hussein, determining that the Loan Agreements "established an arms-length borrower/lender relationship" and Hussein "cannot identify any fact which, if proven at trial, would permit a finding that UBS-FS rendered financial advice to Hussein as UBS Bank's agent."

1.     Fraud

¶23     Hussein asserts that, during the loan process, UBS Bank had a duty to disclose that UBS-FS employees would put UBS Bank's interests before his and that his loans could be canceled without notice and demand.[9] He maintains that certain terms of the Servicing Agreement between UBS Bank and UBS-FS should have been disclosed, in particular that UBS-FS "agreed to follow UBS Bank's instructions to liquidate Hussein's collateral in all circumstances."

¶24     "An action for fraud lies where there are false representations by defendant and reliance thereon by plaintiff to his damage," *Semenov v. Hill*, 1999 UT 58, ¶ 9, 982 P.2d 578 (quotation simplified), including concealments and omissions, *see DeBry v. Valley Mortgage Co.*, 835 P.2d 1000, 1007 (Utah Ct. App. 1992). Whether a duty to disclose certain material facts "'exists is determinable by reference to all the circumstances of the case.'" *Id.* (quoting *Elder v. Clawson*, 384 P.2d 802, 804 (Utah 1963)). "If those circumstances include a relation of trust or confidence, or inequality of condition, a duty may exist." *Id.* But

---

9. Hussein contends that the district court failed to address his fraud claim, but in opposing UBS Bank's motion, Hussein asserted that UBS Bank breached a limited fiduciary duty to disclose under *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 2009 UT 65, 221 P.3d 234. The district court determined that UBS Bank did not owe a limited fiduciary duty under *Davencourt*, and furthermore, it concluded that the Loan Agreements "clearly disclose" the parties' potentially adverse relationship. On appeal, instead of citing *Davencourt*, Hussein relies on case law concerning fraudulent failure to disclose, while asserting basically the same arguments that were considered and resolved by the district court.

such a duty "'will not be found where the parties deal at arm's length, and where the underlying facts are reasonably within the knowledge of both parties. Under such circumstances, the plaintiff is obliged to take reasonable steps to inform himself, and to protect his own interests.'" *Id.* (quoting *Sugarhouse Fin. Co. v. Anderson*, 610 P.2d 1369, 1373 (Utah 1980)). "The false representations or omissions must be knowing or reckless to constitute fraud." *Id.*

¶25 Hussein, an experienced investor who previously worked as a broker and who has a history of dealing with margin loans, testified that he personally reviewed and negotiated the Loan Agreements, which provided, with our emphasis, that "UBS Bank USA and its affiliates will act as creditors and, accordingly, their interests may be inconsistent with, and *potentially adverse* to, [Hussein's] interests." UBS Bank was given the right to liquidate "without demand," "in its sole and absolute discretion," "any part of the Collateral" when UBS Bank "deems itself or its security interest in the Collateral insecure." And it could sell "[a]ny Collateral that may decline speedily in value or that customarily is sold on a recognized exchange or market . . . without providing any Loan Party with prior notice of the sale."

¶26 Referring to UBS-FS as a securities intermediary,[10] the Loan Agreements disclosed that "pursuant to a control agreement between the Bank and the Securities Intermediary":

---

10. Article 8 of the Uniform Commercial Code defines a securities intermediary as "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity." U.C.C. § 8-102(14)(ii) (Unif. Law Comm'n 2017). This provision has been adopted verbatim in Utah. *See* Utah Code Ann. § 70A-8-101(1)(o)(ii) (LexisNexis Supp. 2017).

- The Securities Intermediary will comply with entitlement orders originated by [UBS] Bank regarding any Collateral Account without further consent from the Borrower or any Pledgor.

- [T]he Securities Intermediary may comply with entitlement orders originated by the Borrower . . . on the applicable Collateral Account or any Pledgor but only until the time that [UBS] Bank notifies the Security Intermediary, that [UBS] Bank is asserting exclusive control over the Collateral Account. After the Securities Intermediary has received a notice of exclusive control and has had reasonable opportunity to comply, it will no longer comply with entitlement orders originated by the Borrower or any Pledgor concerning the Collateral Account.

These provisions granted UBS Bank the same control over a client's accounts as the Servicing Agreement, which required UBS-FS employees to "comply with all instructions given by the Bank without further consent by any Borrower or Pledgor, and that the Bank's instructions shall prevail if any conflict exists between any Bank instruction and a Borrower or Pledgor instruction."

¶27 In reviewing the Loan Agreements, Hussein would have been aware that a separate agreement existed between UBS Bank and UBS-FS and that, under the terms of that agreement, if UBS Bank took control of his accounts, UBS-FS's interests would become adverse to his own and UBS-FS would comply with UBS Bank's orders over his own. Moreover, the material terms of the loans indicated that UBS Bank could call for repayment of

Hussein's loans at any time and could liquidate his QSI shares, without notice or demand, if the value of the stock declined.

¶28     Hussein fails to demonstrate the existence of facts establishing that UBS Bank made false representations to him or that it failed to disclose material facts to him during the loan process.[11] The district court therefore properly granted summary judgment on his fraud claims.

2.     Breach of Fiduciary Duty

¶29     Hussein contends that UBS Bank owed him fiduciary duties and breached those duties. "Ordinarily, no fiduciary relationship exists between a bank and its customer." *State Bank of S. Utah v. Troy Hygro Sys., Inc.*, 894 P.2d 1270, 1275 (Utah Ct. App. 1995). *See also First Sec. Bank of Utah NA v. Banberry Dev. Corp.*, 786 P.2d 1326, 1332 (Utah 1990) (stating that "the relation of mortgagor and mortgagee is not of a fiduciary character") (quotation simplified). Instead, we look to the facts and circumstances surrounding the relationship of the parties and the transaction and conclude that a fiduciary or confidential relationship exists only "when one party, having gained the trust

---

11. Hussein further asserts that UBS Bank withheld critical information from him, including the PVF proposal. A constructive fraud claim requires a party to not only demonstrate "'a failure to disclose material facts,'" but also "'a confidential relationship between the parties.'" *d'Elia v. Rice Dev., Inc.*, 2006 UT App 416, ¶ 51, 147 P.3d 515 (quoting *Jensen v. IHC Hosps., Inc.*, 944 P.2d 327, 339 (Utah 1997)). "[A] fiduciary relationship and a confidential relationship are considered one and the same." *Id.* ¶ 55. Because Hussein cannot establish a fiduciary relationship with UBS Bank—or attribute to UBS Bank UBS-FS's actions in regards to the PVF proposal, as explained in the following section—his constructive fraud claim fails.

and confidence of another, exercises extraordinary influence over the other party." *Von Hake v. Thomas*, 705 P.2d 766, 769 (Utah 1985). But "mere confidence in one person by another is not sufficient alone to constitute such a relationship." *Id.* (quotation simplified).

¶30    Hussein has not called our attention to evidence refuting UBS Bank's evidence that there was no fiduciary relationship between them. Hussein's interactions with UBS Bank were at arm's length in 2009 during discussions surrounding the Loan Agreements. Although no fiduciary relationship existed between UBS Bank and Hussein, Hussein asserts that, because such a relationship did exist between him and UBS-FS, fiduciary duties were owed to him by UBS-FS and its employees. And he contends that UBS-FS employees were agents of UBS Bank and that UBS Bank is therefore liable for their actions. "Under agency law, an agent cannot make its principal responsible for the agent's actions unless the agent is acting pursuant to either actual or apparent authority." *Zions First Nat'l Bank v. Clark Clinic Corp.*, 762 P.2d 1090, 1094 (Utah 1988).

a.    Actual Authority

¶31    Hussein contends that the Loan Agreements gave UBS-FS actual authority to act as UBS Bank's agent because UBS-FS "handled all communications with Hussein," including those where he sought financial advice.[12]

_____

12. Hussein also asserts a broad agency relationship based on the Loan Agreements designating UBS-FS as the "Bank's agent." But this language is found in the "Acceptance of Application and Agreement" section of the Loan Agreements and narrowly grants UBS-FS authority to receive and accept the Loan Agreements on UBS Bank's behalf, providing, "This application

(continued…)

¶32 Actual authority may either be express or implied. "Express authority exists whenever the principal directly states that its agent has the authority to perform a particular act on the principal's behalf," while implied authority "embraces authority to do those acts which are incidental to, or are necessary, usual, and proper to accomplish or perform, the main authority expressly delegated to the agent." *Id.* "This authority may be implied from the words and conduct of the parties and the facts and circumstances attending the transaction in question." *Id.* at 1095.

¶33 But Hussein fails to produce any evidence calling into question UBS Bank's showing that UBS-FS had neither express nor implied authority from UBS Bank to give investment advice to Hussein on UBS Bank's behalf. Under the Servicing Agreement, UBS-FS marketed and serviced loans for UBS Bank, and, in particular, it could "inform its customers and prospects regarding the availability of the Loans" and "refer persons interested in a Loan to the Bank." This did not include marketing other financial and investment products, and providing such additional advice was not "incidental" or "necessary" to servicing Hussein's loans where UBS-FS could collect payments and answer questions about the loans. One UBS Bank employee testified in his deposition that UBS Bank did not engage in "investment strategies with the client" or "make financial or investment proposals to a client." Hussein has not meaningfully refuted UBS Bank's showing that if UBS-FS provided such advice to Hussein, it was outside the scope of the services it performed on UBS Bank's behalf.

---

(…continued)

and agreement will be received and accepted by Bank in the State of Utah, or if this application and agreement is delivered to Bank's agent, [UBS-FS], it will be received and accepted."

b.        Apparent Authority

¶34    Hussein contends that UBS-FS had apparent authority to give him financial advice on behalf of UBS Bank because UBS Bank "signaled to Hussein that UBS-FS was its agent in myriad ways." He points to the fact that Financial Advisor filled out personal information on his behalf for the loans, and in the following years, answered any questions Hussein had about the loans.

¶35    Apparent authority "can be inferred only from the acts and conduct of the principal." *City Elec. v. Dean Evans Chrysler-Plymouth*, 672 P.2d 89, 90 (Utah 1983). This type of authority is "premised upon the corporation's knowledge of and acquiescence in the conduct of its agent which has led third parties to rely upon the agent's actions." *Id.* But the authority is not merely apparent "because it looks so to the person with whom he deals." *Id.* The principal must have "cause[d] third parties to believe that the agent [was] clothed with apparent authority." *Id.* "A belief that results solely from the statements or other conduct of the agent, unsupported by any manifestations traceable to the principal, does not create apparent authority." *Burdick v. Horner Townsend & Kent, Inc.*, 2015 UT 8, ¶ 22, 345 P.3d 531 (quotation simplified).

¶36    Hussein cannot demonstrate on the record before us that UBS Bank manifested consent to UBS-FS providing financial advice to Hussein on UBS Bank's behalf.[13] After the loans were

_____

13. Hussein cites two Utah federal district court cases, arguing that similar facts in those cases demonstrate that there is sufficient evidence to show an agency relationship here. But those cases were before the court on a motion to dismiss where "all well-pleaded factual allegations . . . are accepted as true and viewed in the light most favorable to Defendant as the

(continued…)

made, UBS Bank communicated to Hussein that he could "contact [his] Financial Advisor regarding information about [his] Credit Line or other credit services" and the UBS-FS branch manager regarding his "Collateral Account." These communications would have demonstrated to Hussein only that UBS-FS employees had limited authority concerning any questions he had about his loans or his Collateral Account. Hussein fails to point to any other statements or manifestations from UBS Bank indicating that UBS-FS had any broader authority to provide Hussein investment advice on UBS Bank's behalf.

¶37 Hussein therefore has not shown the existence of disputed facts bearing on whether UBS-FS had actual or apparent authority from UBS Bank to provide investment advice to Hussein, much less that UBS Bank breached a fiduciary duty owed to Hussein. Because there are no genuine disputes of material facts on Hussein's Advisory Claims, we conclude that the district court correctly granted summary judgment in favor

---

(…continued)

nonmoving party." *UBS Bank USA v. Ibby, LLC*, No. 2:09-CV-372 TS, 2009 WL 4884383, at *3 (D. Utah Dec. 10, 2009) (quotation simplified). *See also Morales v. UBS Bank USA*, No. 2:14-CV-888-JNP-BCW, 2016 WL 3746527, at *2 (D. Utah July 8, 2016). "By the summary judgment stage of litigation, more is required." *Stevens-Henager College v. Eagle Gate College*, 2011 UT App 37, ¶ 25, 248 P.3d 1025. And "the plaintiff can no longer rest on such mere allegations as are sufficient at the pleading stage, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* (quotation simplified). Accordingly, we look to the specific facts of this case to determine whether an agency relationship existed between UBS Bank and UBS-FS.

of UBS Bank on Hussein's breach of fiduciary duty, fraud, and constructive fraud causes of action.

B.     The Liquidation Claims

¶38    Hussein argues that UBS Bank violated contractual and fiduciary duties when it liquidated 2,276,756 shares of QSI stock securing his loans, thereby breaching the Loan Agreements and the CRA. The district court concluded that UBS Bank "acted pursuant to its clear and indisputable rights under the Loan Agreements" in liquidating Hussein's QSI shares.

1.     Breach of the Loan Agreements

¶39    Hussein contends that UBS Bank's liquidation was neither "necessary" nor "consistent with normal lending practices," thereby breaching the terms of the Loan Agreements. "Well-accepted rules of contract interpretation require that we examine the language of a contract to determine meaning and intent." *Glenn v. Reese*, 2009 UT 80, ¶ 10, 225 P.3d 185. If the contract language is unambiguous, "the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Id.* (quotation simplified). We also "consider each contract provision in relation to all of the others, with a view toward giving effect to all and ignoring none." *Id.* (quotation simplified). But, generally, "specific provisions ordinarily will be regarded as qualifying the meaning of broad general terms in relation to a particular subject." *Smith v. Smith*, 2017 UT App 40, ¶ 16, 392 P.3d 985 (quotation simplified).

¶40    To begin with, the Loan Agreements authorized UBS Bank to "take any steps necessary to perfect its interest in the Credit Line, issue a call for additional collateral or force the sale of the Borrower's securities if the Borrower's actions or inactions call the Borrower's creditworthiness into question." Hussein

cites an email from Financial Advisor to UBS Bank employees, in which Financial Advisor questioned why UBS Bank was liquidating Hussein's shares, stating, "I ask you, is it really necessary to blow Hussein out of the water without any consideration of his situation?" Regardless of Financial Advisor's expressed concerns, UBS Bank could "take any steps necessary to . . . force the sale of [Hussein's] securities," without any requirement that the sale be "necessary" in some absolute sense.

¶41    These same terms, as well as the condition that the steps taken by UBS Bank in forcing a sale be "consistent with normal lending practices,"[14] are also found in the general acknowledgments section of the Loan Agreements. Any conflicts that these terms have with the other provisions of the Loan Agreements are resolved in favor of the specific provisions following them. *See id.* (stating that "to reconcile [an] apparent conflict" courts will employ "the concept that general terms and provisions are restricted by specific terms and provisions following them" and "the specific provision is treated as an exception to the general rule") (quotations simplified). The specific provisions that followed the general acknowledgments section specified a number of events where UBS Bank could liquidate Hussein's QSI shares, including when "the Bank otherwise deems itself or its security interest in the Collateral insecure." In such events, "the Credit Line Obligations will become immediately due and payable (without demand)."

---

14. Hussein contends that UBS Bank failed to follow "normal lending practices" because it did not follow its own written procedures by issuing a margin deficiency notice to Hussein prior to selling his QSI shares. However, UBS Bank did not require margin deficiency notices be given to clients and gave them to clients only as a courtesy.

¶42 Nevertheless, Hussein argues that "UBS Bank could not have deemed itself insecure," declaring that the loans were "fully secured" because he had assets totaling $85 million. The Loan Agreements stipulated, however, that UBS Bank could "deem[] itself or its security interest in the Collateral insecure." The focus of these provisions was not on the insecurity of the loans themselves. Once UBS Bank deemed itself or its security insecure, "the Credit Line Obligations will become immediately due and payable (without demand)" and UBS Bank could "in its sole and absolute discretion, liquidate, withdraw or sell all or any part of the Collateral." And "[a]ny Collateral that may decline speedily in value or that customarily is sold on a recognized exchange or market" could "be sold without providing any Loan Party with prior notice of the sale."

¶43 Because Hussein's collateral had declined substantially in value by July 2012, UBS Bank deemed itself insecure. Financial Advisor alerted Hussein to this fact, notifying him that "[o]ur credit department is insisting we first sell [QSI] shares (about 25,000 shares), or bring in cash or additional [c]ollateral that is not [QSI]." Despite Hussein's personal ability to cover the insecurity, the Loan Agreements provided that Hussein's loans became "immediately due and payable (without demand)" and UBS Bank had the right "in its sole and absolute discretion" to liquidate Hussein's 2,276,756 QSI shares and apply the proceeds as repayment. Because the shares "decline[d] speedily in value" and were sold on a market or exchange, UBS Bank did not have to give Hussein any notice of the sale given the terms of the Loan Agreements. Against the backdrop of these contractual provisions, Hussein has not provided any evidence establishing that UBS Bank improperly liquidated his collateralized QSI shares and breached the Loan Agreements.

2.      Breach of the CRA

¶44    Hussein contends that by following UBS Bank's entitlement orders, UBS-FS breached the CRA when it failed to send Hussein a margin deficiency notice and that UBS Bank interfered with fiduciary duties owed by UBS-FS to Hussein. These are the grounds for his claims of tortious interference with contract and aiding and abetting breach of a fiduciary duty.

¶45    First, there is no evidence suggesting that the CRA required UBS-FS to send Hussein a margin deficiency notice.[15] The terms of the CRA stipulated that UBS-FS "may sell securities in your Account without notifying you" and that UBS-FS had "the right, at any time and without prior notice, to satisfy a margin call or to obtain full payment of a margin loan, without a demand for margin or additional margin." UBS-FS policies did permit margin deficiency notices to be given to the customer as a

_____

15. Hussein also claims that UBS Bank and UBS-FS never notified him of the 50% margin maintenance requirement. However, Financial Advisor sent Hussein loan disclosure forms indicating that the Federal Reserve Board required an initial 50% margin requirement. From all that appears in the record, UBS Bank and UBS-FS did not adjust this margin requirement after the loans were issued and Hussein was required to maintain an ongoing 50% margin maintenance level in his account. But whether Hussein received this notification is not material to his Liquidation Claims because UBS Bank liquidated the shares after deeming itself insecure due to the declining value of the collateral and not because of Hussein's failure to maintain his margin requirement. A separate provision of the Loan Agreements would have granted UBS Bank the right to liquidate Hussein's shares had he not "maintain[ed] sufficient Collateral in a Collateral Account" or "fail[ed] to maintain collateral as required."

courtesy in some cases. And, as a courtesy, Hussein was notified prior to the liquidation that his margin account was deficient by $600,000, but five days passed and he had not taken any action to cover the shortfall in his margin account by some other means. Hussein has not shown the existence of disputed facts that undercut the conclusion that in following UBS Bank's entitlement orders, UBS-FS did not breach the CRA because no margin deficiency notice was required.

¶46    Second, Hussein asserts that UBS Bank caused UBS-FS employees "to ignore Hussein's order to sell the PMP Account[s]" and therefore aided and abetted a breach of a fiduciary duty by UBS-FS. A party aids and abets the breach of a fiduciary duty when it "knowingly join[s] a fiduciary in fraudulent acts, whereby the fiduciary breaches his or her fiduciary duties," and is therefore "jointly and severally liable with that fiduciary." *Russell/Packard Dev., Inc. v. Carson*, 2003 UT App 316, ¶ 33, 78 P.3d 616 (quotations simplified), *aff'd*, 2005 UT 14, 108 P.3d 741. But "the gravamen of the claim of aiding and abetting a breach of fiduciary duty is the defendant's knowing participation in the fiduciary's breach." *Mower v. Simpson*, 2012 UT App 149, ¶ 37, 278 P.3d 1076 (quotation simplified). In resisting UBS Bank's summary judgment motion, Hussein produced no evidence that UBS Bank aided or abetted UBS-FS in a breach of a fiduciary duty owed to Hussein.

¶47    Hussein was aware that UBS Bank and UBS-FS's interests could become adverse to his own if he failed to maintain sufficient margin in his account.[16] Financial Advisor sent

16. On Hussein's constructive fraud claim, he argued that UBS Bank and UBS-FS never disclosed to him that UBS Bank's interests would be put before his own. He contends that UBS-FS misrepresented to him that his QSI shares would not be sold. But while UBS-FS indicated that it would possibly give him time to

(continued…)

Hussein loan disclosure forms warning that "if the securities in your margin account decline in value, so does the value of the collateral supporting your loan and, as a result, [UBS-FS] can take action, such as . . . selling securities or other assets in any of your accounts held at [UBS-FS]." And the Loan Agreements provided that UBS-FS would comply with UBS Bank's orders over Hussein's instructions and that if UBS Bank deemed the collateral insecure, it could "in its sole and absolute discretion, liquidate, withdraw or sell all or any part of the Collateral." Hussein therefore could not order UBS-FS to liquidate the collateral in any manner he wished after UBS Bank deemed his collateralized QSI shares inadequate as security for the loans. This included his preference that the PMP accounts be liquidated first, which was a risk that he accepted when he borrowed the $35.5 million from UBS Bank on the terms he agreed to because "any and all accounts" with UBS-FS became collateral for the loans. Because UBS Bank could, "in its sole and absolute discretion," liquidate the QSI shares as repayment for the loans when the value of the stock declined, it did not aid or abet UBS-FS in a breach of a fiduciary duty to Hussein.

¶48   Because Hussein fails to demonstrate that there are genuine disputes of material fact remaining on the Liquidation Claims, the district court did not err in determining that UBS Bank was entitled to judgment as a matter of law on Hussein's

---

(…continued)

either secure cash or additional collateral to cover the shortfall, Hussein did not produce evidence that UBS Bank gave him such assurances, and UBS Bank has shown that it was unwilling to take such a risk in waiting longer to see whether Hussein would cover the growing margin deficiency in some other way. Hussein was aware that, in such circumstances, UBS-FS would have to comply with UBS Bank's orders, not his.

breach of contract, tortious interference of contract, and aiding and abetting breach of fiduciary duty claims.

## II. Attorney Fees

¶49 Hussein contends that the district court erred in awarding attorney fees and costs to UBS Bank. "Generally, attorney fees are awarded only when authorized by contract or by statute." *Bilanzich v. Lonetti*, 2007 UT 26, ¶ 11, 160 P.3d 1041. "When awarded pursuant to a contract, attorney fees are 'allowed only in accordance with the terms of the contract.'" *PC Crane Service, LLC v. McQueen Masonry, Inc.*, 2012 UT App 61, ¶ 9, 273 P.3d 396 (quoting *Turtle Mgmt., Inc. v. Haggis Mgmt., Inc.*, 645 P.2d 667, 671 (Utah 1982)).

¶50 In this case, the Loan Agreements provided that Hussein would "indemnify" UBS Bank "against any and all claims," and "damages," including "court costs and reasonable attorney fees," "arising out of or in connection with this [a]greement." The only exception was for losses "caused by the Bank's or Securities Intermediary's breach of its obligations under this Agreement." Because the district court granted summary judgment in favor of UBS Bank on all of Hussein's claims, which necessarily arose "out of or in connection with" the Loan Agreements, the district court awarded attorney fees and costs to UBS Bank. Because Hussein failed to produce evidence refuting UBS Bank's showing that it did not breach the Loan Agreements,[17] the

---

17. Hussein argues that a Financial Industry Regulation Authority (FINRA) arbitration panel found UBS-FS to have breached the Loan Agreements and that therefore no attorney fees should be granted. This arbitration decision is irrelevant to this appeal to which UBS-FS is not a party, *see Buckner v. Kennard*, 2004 UT 78, ¶ 11, 99 P.3d 842 (holding that "a private arbitration award does not have nonmutual collateral estoppel

(continued…)

district court did not err in awarding attorney fees and costs to UBS Bank.

¶51    UBS Bank seeks an award of its attorney fees reasonably incurred on appeal. "[W]hen a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." *Valcarce v. Fitzgerald*, 961 P.2d 305, 319 (Utah 1998) (quotation simplified). Accordingly, we award UBS Bank its attorney fees reasonably incurred on appeal and remand to the district court for the calculation of that award.

## CONCLUSION

¶52    We affirm the district court's grant of summary judgment in favor of UBS Bank because Hussein failed to demonstrate the existence of any genuine dispute of material fact on his six claims against UBS Bank. We also affirm the award of attorney fees and costs to UBS Bank and award attorney fees reasonably incurred on appeal, remanding to the district court for the limited purpose of calculating that award.

---

(…continued)
effect unless the parties expressly provide for such preclusive effect beforehand"), and in any event, the decision contains no findings of fact or any indication of the basis on which the arbitration panel made its ruling.