**2022 UT App 30**

## THE UTAH COURT OF APPEALS

STEIN ERIKSEN LODGE OWNERS ASSOCIATION INC. AND
STEIN ERIKSEN LODGE MANAGEMENT CORP.,
*Appellees,*
*v.*
MX TECHNOLOGIES INC.,
*Appellant.*

Opinion
No. 20200256-CA
Filed March 10, 2022

Third District Court, Salt Lake Department
The Honorable Su Chon
No. 169903978

Alexander Dushku, Justin W. Starr, Robert E.
Mansfield, and Megan E. Garrett, Attorneys
for Appellant

Troy L. Booher, Taylor Webb, Joelle S. Kesler,
Jonathan W. Gold, Steven M. Rudner, and John C.
Josefsberg, Attorneys for Appellees

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES JILL M. POHLMAN and DIANA HAGEN concurred.

HARRIS, Judge:

¶1     After being asked by her superiors to help plan a major corporate conference, the Events Manager of MX Technologies Inc. (MX) signed contracts—totaling more than $350,000—for rooms, food, and services at the Stein Eriksen Lodge (Stein). MX later decided not to hold the conference, and claimed that the contracts were invalid, in whole or in part, because Events Manager did not have authority to sign them, and because the contracts' liquidated damages provisions were unconscionable. Stein sued MX for breach of contract, and the district court

entered summary judgment in Stein's favor, concluding that, as a matter of law, Events Manager had authority to sign the contracts and the liquidated damages provisions are not unconscionable.

¶2 MX now appeals, and we affirm in part and reverse in part. We agree with the district court that, as a matter of law, the liquidated damages provisions are not unconscionable, and affirm that portion of the court's ruling. We also affirm the court's implied determination that MX did not cancel any contractual relationship between the parties until just sixty days before the event was to begin. But we conclude that questions of fact preclude summary judgment on the other issues presented, including whether Events Manager had authority to execute the contracts, and whether MX ratified those contracts following their execution. We therefore vacate that portion of the court's ruling and remand the case for further proceedings.

BACKGROUND[1]

¶3 In October 2015, MX began internal discussions about hosting a major corporate conference, to which it planned to invite current and prospective clients. In an attempt to "get something on the calendar" for the event, the company's Director of Community and Client Advocacy sent an email explaining the vision, goals, and potential agenda of the event. Among the recipients of this email were—in order of placement on the corporate organizational chart—the company's Chief Financial Officer (CFO), Marketing Director, Events Manager,

---

1. When reviewing a grant of summary judgment, we view "the facts in a light most favorable to the losing party below." *Goodnow v. Sullivan*, 2002 UT 21, ¶ 7, 44 P.3d 704 (quotation simplified).

and Events Coordinator. At the time, Events Manager was twenty-four years old, and had been hired by MX only a few months earlier. Events Coordinator reported to Events Manager, who reported to Marketing Director, who reported to the company's newly hired Chief Marketing Officer (CMO). Events Manager and Events Coordinator were tasked with the assignment of negotiating a prospective contract with Stein, which had been tentatively selected as the site for the potential event. The pair soon began correspondence with Stein, and in November they participated in a site visit, during which they toured Stein's facilities.

¶4    After the site visit, Events Coordinator continued to correspond with Stein, expressing continued interest in the venue but noting that, because MX had just hired a new CMO, she needed "to get approval from him before moving forward." Stein responded that other groups were also interested in booking its facilities during the same time period and expressed some sense of urgency, indicating that it needed a commitment from MX in order to hold the rooms open.

¶5    The following week, MX's marketing department—including Marketing Director, Events Manager, and the new CMO—met to discuss the event. At this meeting, the group made the decision to move forward with the conference, and CMO noted that they needed to "get cranking" to lock down the venue by the end of the year.

¶6    Events Manager called Stein later that day to discuss contract terms, including deposits, cancellation, and liquidated damages. A few days later, Stein emailed proposed contracts to both Events Manager and Events Coordinator. Events Manager informed Stein that MX would need some time to review the contracts "and have [its] legal team also glance over [them]" before they could be executed.

¶7 More than two weeks went by without a response. On New Year's Eve, Stein followed up with Events Manager, alerting her that another group had submitted a proposal that conflicted with MX's proposed dates and asking to "confirm everything and finalize the contract." Apprehensive about the possibility of losing the dates, Events Manager signed the contracts[2] on December 31, 2015. According to the contracts, the conference was to begin on August 1, 2016.

¶8 Under the terms of the contracts, MX agreed to pay for 720 room nights (the room charges totaled $176,080) and for at least $146,000 for food and drink charges, plus a 23% service charge. In total, the contracts obligated MX to pay more than $350,000 to Stein for services related to the conference. The contracts also contained liquidated damages provisions specifying the amount MX would pay if it cancelled the event. If cancellation occurred between sixty-one and ninety days prior to the event, MX would be required to pay 90% of the contracted amount. But if cancellation occurred sixty or fewer days prior to the event, MX would be required to pay the entire contracted amount. During some of the back-and-forth prior to the contracts being signed, Stein had told Events Manager that it would be "flexible" with its deposit and cancellation policies.

¶9 Pursuant to MX company policy, any payment over $20,000 had to be approved by the CFO. Prior to Events Manager signing the contracts, however, no such approval was obtained. During her deposition, Events Manager testified that she had received approval from Marketing Director, if not from CFO, but

---

2. There were two contracts: one for rooms at the Stein Eriksen Lodge itself and one for rooms at the Chateaux Deer Valley, a related property. For ease of reference, we refer to both properties simply as "Stein."

Marketing Director disputes this testimony.[3] As Marketing Director tells it, not only did she not provide approval for Events Manager to sign the contracts, she did not even learn, until many months later when MX received a demand for payment from Stein, that the contracts had been signed.

¶10  A few months before signing the contracts at issue, Events Manager had executed at least one other similar contract, this one with Sundance Resort. The full details of the Sundance contract are not contained in the appellate record; for example, the record does not tell us whether Events Manager obtained prior approval from MX executives to sign it, nor does it tell us the total value of the contract. The record does, however, indicate that the Sundance contract was for 105 room nights, which likely would have been valued at more than $20,000, thus triggering MX's company approval policy described above.

¶11  The Stein contracts required two relatively small ($2,500) deposits to be paid upon signing, with an additional larger ($75,000) deposit due a few weeks later. Events Manager paid the $2,500 deposits on January 5, 2016, and did so using Marketing Director's company credit card. Marketing Director testified, however, that her awareness of these small deposits did not equate to awareness of executed contracts, because she

---

3. Events Manager also later attempted to dispute her own prior testimony. About nine months after her deposition, in connection with its motion for summary judgment, MX submitted a sworn declaration from Events Manager in which she expressly denied receiving any sort of permission from Marketing Director to sign the contracts. Stein moved to strike that declaration, in part because it contradicted Events Manager's deposition testimony, and the district court granted that motion. MX does not appeal the court's decision to strike that declaration.

thought these charges were merely for Stein to "hold" the dates. The new CMO was apparently under the same impression.

¶12     Aside from making the small deposit payments, MX took other actions, after the contracts were signed, in preparation for the conference. In February 2016, Marketing Director contacted an audiovisual technician about potential needs for the event. And in April, MX's creative director spoke by phone with Stein about video footage that MX might use in promoting the event. Several MX representatives, including Events Manager, also traveled to Stein for a planning visit. And MX recruited—and signed a contract with—a keynote speaker for the event, and began to promote the conference internally. Indeed, Events Manager—at the direction of Marketing Director—sent a company-wide email promoting the conference, stating as follows:

> We're excited to announce we'll be holding our inaugural MX conference [during the first week of August] at the Stein Eriksen in Deer Valley, UT. This conference will be a mix of both current clients and prospects and very similar to [previous conferences] but on a larger scale. All prospects and clients are welcome to attend . . . . Please start reaching out to your clients now so they have these dates on their schedules. We have created a save the date [web]page with more details on it for you to send along with your invitations . . . . You can expect to receive more details in the coming weeks. In the meantime let me know if you have any questions.

The "save the date" webpage identified the location, date, and speakers for the conference, including the aforementioned keynote speaker.

¶13 Both CFO and CMO testified that, at the time this email went out, they were unaware of the existence of the signed contracts. As CMO saw it, MX was still "testing the waters" at this point, and the purpose of the email was to see if there were enough interested and available clients to move forward. And CFO reasoned that it was necessary to reach out to clients *before* making a contractual commitment because, until the company knew how many clients planned to attend, it would not know how many rooms to reserve.

¶14 MX had not, however, paid the larger $75,000 deposit which, pursuant to the contracts, was due in February. In March, after Stein had contacted Events Manager to inquire about the past-due deposit, Events Manager raised the issue with CMO and Marketing Director. Both of them were under the impression that payment of the $75,000 deposit is what would formally commit MX to the event. At their instruction, Events Manager asked Stein if MX could defer the deposit until "Q2," and Stein agreed.

¶15 In late April, Events Manager sent a $75,000 invoice—for the Stein deposit—to MX's accounting department. The accounting department told Events Manager that the invoice, along with any corresponding contract, needed to go through MX's accounting software for approval. Thereafter, the invoice reached CFO, who responded that it was "not approved."

¶16 When Stein inquired again about the late deposit, Events Manager replied that CFO had been "road blocking this" and was out of town, but that they were "planning on discussing this with him first thing so we can get it paid ASAP." Stein responded by expressing its concern that CFO was "delaying a contractual obligation" and—for the first time—taking the view that MX was "in default" and had committed "a breach of agreement."

¶17 This email exchange caught the attention of Marketing Director, who emailed CFO and CMO, alerting them that she was "atwitter regarding the news that [CFO] is considering pulling the plug" on the conference and noting that MX had "signed a contract with Stein Eriksen that we cannot get out of." According to CFO and CMO, this email—sent on May 13—was how they first became aware of the existence of signed contracts.

¶18 Thereafter, on May 25, CFO attempted to negotiate a resolution with Stein, explaining in an email that, in his view, the contracts had not been approved per corporate policy, and had been "executed by an employee who [was] not authorized to sign on behalf of or legal[ly] bind MX." He proposed, however, that MX could hold a smaller conference on the August 2016 dates or, alternatively, could bump the larger conference to the following summer. His email concluded by stating that, "[a]lthough this is not an optimal start to a future partnership, I am looking forward to a valuable relationship between MX" and Stein. After learning, however, that Stein was not interested in either of those options, CFO sent a follow-up letter stating that MX did not intend to stage any conference at Stein in 2016 and "providing notice that MX [did] not intend to do business with [Stein] now or in the future." That letter was dated June 2, 2016—exactly sixty days before August 1, the day the conference was to begin.

¶19 A few weeks later, Stein filed suit for breach of contract, seeking $350,660 in liquidated damages—or, in the alternative, actual damages in an amount to be proved at trial—plus interest and attorney fees. Eventually, both sides filed competing motions for summary judgment. Stein asserted that, as a matter of law and undisputed fact, Events Manager either had authority to sign the contracts or, alternatively, that MX ratified the contracts after execution. In addition, Stein asserted in a separate motion that it was entitled to liquidated damages because the relevant contractual provisions were enforceable and MX's

unconscionability defense failed as a matter of law. MX filed memoranda opposing Stein's motions, and in addition filed its own motion, asserting that as a matter of law and undisputed fact, Events Manager had no authority to bind MX and that MX had not ratified the contracts. MX did not file a cross-motion regarding the enforceability of the liquidated damages provision. Both parties presented reports from expert witnesses in support of their positions: Stein's expert asserted that—within the hospitality industry—it is reasonable to assume that an employee who carries the title of "events manager" has authority to sign large contracts on behalf of her company. MX's expert disagreed. The experts also disagreed as to whether the liquidated damages provision was standard within the industry.

¶20    After full briefing and oral argument, the district court granted Stein's motions and denied MX's. The court determined that Events Manager had authority to sign the contracts and that, even if she did not, her "actions were ratified by MX upper management." The court also determined that the liquidated damages provisions were not unconscionable, concluding that they "appear[] to be standard in the hospitality industry."

¶21    Following its ruling, the court entered judgment in Stein's favor in the amount of $651,818.83, an amount that included liquidated damages totaling $350,660 and prejudgment interest totaling $301,158.83. The liquidated damages total was based on the assumption that the contracts were cancelled on June 2, 2016—sixty days before the conference was to begin—and thus represented 100% (rather than 90%) of the contracted amount. The court later issued an award of attorney fees and costs to Stein, augmenting the judgment not only in the amount of the attorney fees award ($377,430.77) but also to account for additional interest on the original award. The total judgment amount against MX now exceeds $1 million.

ISSUE AND STANDARD OF REVIEW

¶22    MX appeals from the district court's summary judgment order and the resulting judgment. Specifically, however, it does not appeal the denial of its own motion, just the grant of Stein's, contending on appeal that "[n]umerous disputed issues of material fact preclude summary judgment on the issues of authority and ratification," and that the court erred by deciding the liquidated damages issue on summary judgment and "not after a full and fair trial where witnesses could be assessed."[4]

¶23    Summary judgment is appropriate only "if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, we ask "whether reasonable jurors, properly instructed, would be able to come to only one conclusion, or if they might come to different conclusions, thereby making summary judgment inappropriate." *Heslop v. Bear River Mutual Ins. Co.*, 2017 UT 5, ¶ 20, 390 P.3d 314 (quotation simplified). "We review a [district] court's legal conclusions and ultimate grant or denial of summary judgment for correctness, viewing the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving

---

4. It appears MX may be attempting to argue, here on appeal, that issues relating to the unconscionability of the liquidated damages provisions can be decided as a matter of law in its favor. But MX did not make a summary judgment motion of its own on this point below; instead, it merely resisted Stein's, asking the court to deny Stein's motion "because there are disputed issues of material fact." Thus, any request for judgment as a matter of law in MX's favor on these issues is unpreserved. And in any event, as discussed below, we affirm the district court's grant of summary judgment to Stein on these issues.

party." *Heartwood Home Health & Hospice LLC v. Huber*, 2020 UT App 13, ¶ 11, 459 P.3d 1060 (quotation simplified).

ANALYSIS

¶24    In challenging the district court's summary judgment order, MX asserts three distinct arguments. First, it contends that the court erred by determining, as a matter of law, that the contracts were valid. In particular, MX asserts that questions of fact remain as to whether Events Manager had authority to sign the contracts, and if not, whether MX ratified Events Manager's unauthorized act. Second, MX argues that, even if the contracts were authorized, they contain liquidated damages provisions that are unconscionable, and that the court erred by determining otherwise. Finally, MX contends that the court erred by assuming—and impliedly determining as a matter of law—that the cancellation of any supposed contracts occurred on June 2, and not on May 25. We discuss each of MX's arguments, finding merit in its first argument but rejecting the others.

I. The Validity of the Contracts

¶25    It is well established that, "[u]nder agency law, an agent cannot make its principal responsible for the agent's actions unless the agent is acting pursuant to either actual or apparent authority." *Zions First Nat'l Bank v. Clark Clinic Corp.*, 762 P.2d 1090, 1094 (Utah 1988). While it is clear that the district court concluded, as a matter of law, that Events Manager had authority to sign the contracts, it is unclear whether the court determined that she had actual or apparent authority (or both). And the court concluded, in the alternative, that MX ratified the contracts in any event. On appeal, MX takes issue with these rulings, asserting that genuine disputes of material fact exist with regard to each one, rendering summary judgment inappropriate. We discuss these topics, in turn.

A.     Actual Authority

¶26    In assessing whether Events Manager had actual authority to sign the contracts, we must examine "the acts of the principal from the agent's perspective." *Diston v. EnviroPak Med. Products, Inc.*, 893 P.2d 1071, 1076 (Utah Ct. App. 1995). At root, this inquiry turns on the reasonableness of the agent's belief that she possessed sufficient authority. *See* Restatement (Third) of Agency § 2.01 (Am. L. Inst. 2006) ("An agent acts with actual authority when . . . the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act."); *see also 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1251 (10th Cir. 2013). The inquiry contains both an objective and a subjective component: the agent must subjectively hold the belief that she possesses authority, and that belief must be objectively reasonable in light of the principal's actions. *See* Restatement (Third) of Agency § 2.02 cmt. e ("This standard requires that the agent's belief be reasonable, an objective standard, and that the agent actually hold the belief, a subjective standard."). On appeal, MX does not argue that Events Manager lacked a subjective belief that she was authorized to sign the contracts, and we therefore assume for purposes of our analysis that Events Manager—in accordance with her deposition testimony—possessed such a belief. But we agree with MX that questions of fact preclude summary judgment on the question of whether Events Manager's belief was objectively reasonable.

¶27    In evaluating the objective part of the test, we examine whether the agent's belief was reasonable under the circumstances, in light of the actions and manifestations of the principal. *See id.* ("Whether an agent's belief is reasonable is determined from the viewpoint of a reasonable person in the agent's situation under all of the circumstances of which the agent has notice."). A principal may confer actual authority expressly, or it may do so through other less overt actions that

nevertheless imply a grant of authority. *See Hussein v. UBS Bank USA*, 2019 UT App 100, ¶ 32, 446 P.3d 96 ("Actual authority may either be express or implied."). Express authority is present when "the principal directly states that its agent has the authority to perform a particular act on the principal's behalf." *Id.* (quotation simplified). Implied authority stems "from the words and conduct of the parties and the facts and circumstances attending the transaction in question." *Id.* (quotation simplified).

¶28 On the issue of express authority, there was evidence that, pursuant to MX company policy, any payment over $20,000 had to be run through company software and approved by CFO. But CFO unequivocally testified that Events Manager "did not have authority to sign" the Stein contracts on behalf of MX. Even Events Manager, in her deposition testimony, did not assert that CFO gave her authorization to sign; instead, she claimed only that she received authority from Marketing Director. That claim is not only contested by Marketing Director as a factual matter, but it is also unclear whether—in light of the evidence regarding MX company policy—Marketing Director herself had authority to authorize Events Manager to sign the contracts, or whether Events Manager might reasonably have so believed. We agree with MX that, in light of these disputed factual issues, Events Manager cannot be said to have possessed express actual authority as a matter of law.

¶29 With regard to implied actual authority, we reach the same conclusion. In defense of the district court's summary judgment ruling, Stein points principally to the Sundance contract, and asserts that Events Manager had to have reasonably believed that she had authority to sign the Stein contracts because she had previously signed the similar Sundance contract. But the presence of the Sundance contract—while perhaps indicative of implied authority—is not enough to establish the reasonableness of Events Manager's belief as a

matter of law. As noted, *see supra* ¶ 10, the record submitted to us on appeal does not tell us enough about the Sundance contract to warrant summary judgment. Indeed, we do not know the total value of the Sundance contract, nor do we know whether Events Manager received express approval from CFO to sign it. For instance, in the event that she received the necessary express approval to sign the Sundance contract, but not the Stein contracts, and that she was aware of prevailing company policy regarding contracts, a reasonable factfinder could conclude that any belief she might have held that she actually had authority to sign the Stein contracts was unreasonable.

¶30 In sum, we discern factual disputes that preclude summary judgment on the issue of whether Events Manager possessed actual authority from MX to sign the Stein contracts.

B.    Apparent Authority

¶31 Next, we must examine whether Events Manager had apparent authority—as a matter of law and undisputed fact—to sign the Stein contracts. One key difference between actual and apparent authority is the point of view from which these doctrines are assessed. As noted above, actual authority is evaluated "from the agent's perspective." *See Diston*, 893 P.2d at 1076. Proper analysis of apparent authority, by contrast, "focuses on the acts of the principal from a third party's perspective." *Id.*

¶32 Apparent authority exists "when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestation." *Burdick v. Horner Townsend & Kent, Inc.*, 2015 UT 8, ¶ 21, 345 P.3d 531 (quotation simplified). The agent's manifestations to the third party are alone insufficient; that is, the principal must have taken some action, known to the third party, that causes the third party to reasonably believe that the agent had authority. *See id.* ¶ 22 ("The authority of an agent is not apparent merely

because it looks so to the person with whom he deals, but rather, it is the *principal* who must cause third parties to believe that the agent is clothed with apparent authority." (quotation simplified)); *see also Grazer v. Jones*, 2012 UT 58, ¶ 11, 289 P.3d 437 ("Where the principal does something to support a third party's reasonable belief that the agent has the authority to act, that agent is vested with apparent authority to bind the principal."). Our supreme court has articulated a "three-part test for apparent authority," all three parts of which must be met: (1) the principal must have "manifested his or her consent to the exercise of such authority or [have] knowingly permitted the agent to assume the exercise of such authority"; (2) the third party must "kn[o]w of the facts and, acting in good faith, ha[ve] reason to believe, and did actually believe, that the agent possessed such authority"; and (3) the third party must have "rel[ied] on [the agent's] appearance of authority" and must have "changed his or her position and will be injured or suffer loss if the act done or transaction executed by the agent does not bind the principal." *Burdick*, 2015 UT 8, ¶ 23 (quotation simplified).

¶33   In this case, Stein is the third party, and does not claim to have had any communication, prior to the execution of the contracts, with anyone at MX other than Events Manager and her subordinate, Events Coordinator. And MX quite sensibly points out that, if Events Manager cannot bind the company, then neither can her subordinate, Events Coordinator.

¶34   In the absence of any direct manifestations or communications from MX higher-ups, Stein asserts that apparent authority can be inferred from the fact that MX conferred the title "Events Manager" on its representative, and claims that such a title, by itself, communicates to third parties that Events Manager had authority to sign contracts on MX's behalf related to corporate events. A reasonable jury, after hearing all the evidence, might well reach that conclusion. But

we disagree with Stein that, on this record, such a conclusion is compelled as a matter of law.

¶35   Stein correctly asserts that, where a third person "of ordinary prudence," and who is "conversant with business usages and the nature of the particular business, is justified in presuming" that the agent has the requisite authority, "the principal is estopped," by virtue of apparent authority, "from denying the agent's authority." *See Grazer*, 2012 UT 58, ¶ 11 (quotation simplified). Thus, if Stein could establish, as a matter of law, that in the hospitality industry the title "Events Manager" is commonly believed to confer authority to sign contracts related to events, then Stein would be entitled to summary judgment. But Stein cannot establish that on this record.

¶36   To be sure, Stein's expert opines that "it is custom and practice in the hospitality industry that Event Managers sign contracts," and that this is true "regardless of the size of the event." But MX's expert disagrees with this opinion, and opines that, in the industry, an "Event Manager" "generally does not have authority to enter into large contracts for and on behalf of the event manager's employer," and that reasonable actors within the industry "do not accept that a person using the title 'Event Manager' is the person that can commit a company to a meeting space." Thus, on this record, the dueling experts have created a classic question of fact as to the reasonableness of Stein's belief that an Events Manager could bind MX to contracts of this size.

¶37   Finally, Stein asserts that it was entitled to infer authority from the fact that Events Manager told Stein that the contracts required legal and corporate review, and then two weeks later signed the contracts. As Stein sees it, it was at that point entitled to a reasonable belief "that the contracts had undergone internal and legal review." The district court accepted this argument,

concluding that Stein could have "reasonably assume[d] that the corporate hurdles had been satisfied." But MX correctly points out that any valid manifestation of apparent authority needs to have come from the principal, not from the agent, and that no evidence of any direct manifestation is present in this record. At a minimum, inferring apparent authority from Events Manager's actions in executing the contracts cannot, on this record, be appropriately accomplished as a matter of law.

¶38 In sum, we discern factual disputes that preclude summary judgment on the issue of whether Events Manager possessed apparent authority from MX to sign the Stein contracts.

C. Ratification

¶39 Next, we must consider whether MX—as a matter of law and undisputed fact—ratified the Stein contracts after Events Manager executed them. Under our law, contracts that are signed by an agent even in the absence of actual or apparent authority may nevertheless be ratified after the fact by the principal. *See Bradshaw v. McBride*, 649 P.2d 74, 78 (Utah 1982) ("A principal may impliedly or expressly ratify an agreement made by an unauthorized agent."). Post-contract ratification, just like pre-contract bestowal of authority, can occur expressly or be implied from other actions. *Id.*; *see also Bullock v. Utah Dep't of Transp.*, 966 P.2d 1215, 1218 (Utah Ct. App. 1998) ("Ratification, like original authority, need not be express." (quotation simplified)). There is no indication, in this case, that MX expressly ratified the Stein contracts after Events Manager signed them. But Stein contends—and the district court ruled—that MX impliedly ratified them through other actions.

¶40 Implied ratification occurs through "conduct which indicates assent by the purported principal to become a party to the transaction or which is justifiable only if there is ratification."

*Bradshaw*, 649 P.2d at 78 (quotation simplified). However, a court cannot "infer ratification of a contract unless [it] conclude[s] that the principal knowingly assented to the material terms of the contract." *Bullock*, 966 P.2d at 1218. Ratification thus "requires the principal to have knowledge of all material facts and an intent to ratify." *Dillon v. Southern Mgmt. Corp. Ret. Trust*, 2014 UT 14, ¶ 28, 326 P.3d 656 (quotation simplified). "In essence, the doctrine of implied ratification protects both a principal's agent and the co-parties to a contract by ensuring that the principal cannot repudiate the contract after the fact if any reasonable person would have concluded from the principal's actions at the time of the transaction that the principal endorsed the contract." *Bullock*, 966 P.2d at 1219.

¶41    In granting summary judgment in favor of Stein on the issue of ratification, the district court set forth a bullet-point list of apparently undisputed facts that it believed supported its decision. Stein relies on many of those same facts in arguing, here on appeal, that the court's decision should be affirmed. While we acknowledge that many of these facts may be helpful to Stein when it argues its case to the factfinder on remand, we do not agree that those listed facts—or any others brought to our attention—compel the conclusion that MX, as a matter of law, ratified the contracts. In our view, a reasonable jury could find otherwise. More specifically, and as we explain below, the facts in the district court's list are either irrelevant to the ratification inquiry or are the subject of a factual dispute.

¶42    The first fact listed by the district court was that both CMO and Marketing Director were "involved" in selecting Stein as the presumptive choice for the event from among its list of potential venues. This fact sheds little, if any, light on the ratification inquiry, because it describes events that took place before Stein sent Events Manager copies of the draft contracts, and several weeks before Events Manager signed them. The fact that MX executives instructed Events Manager to

attempt to negotiate the terms of a contract with Stein does not tell us much, if anything, about whether those same executives later ratified the terms of the contracts Events Manager ultimately signed.

¶43 The next listed fact is that Marketing Director "directed [Events Manager] to sign the contract and charge the initial deposit." But as previously noted, *see supra* ¶¶ 9, 28, Events Manager's testimony that Marketing Director instructed her to sign the Stein contracts is the subject of a pointed factual dispute. As for the $2,500 deposits paid in January 2016, both Marketing Director and CMO—apparently the only MX executives who knew about those payments—believed them to serve merely as a "hold" for the dates at Stein, and not indicative of the fact that binding contracts had already been signed. A reasonable jury could elect to credit the MX executives' testimony, and on that basis could determine that the deposits did not indicate corporate ratification of the Stein contracts.

¶44 Next, the district court relied on the fact that several employees of MX—including Events Coordinator, Marketing Director, and an assistant controller—learned about the existence of the signed contracts at an earlier point in time than did CFO or CMO. The fact that Events Coordinator—Events Manager's subordinate—knew about the signed contracts is irrelevant to ratification, because not even Stein contends that Events Coordinator is the type of MX executive who could have bound the company. And the same goes for an assistant controller from MX's accounting department: there exists at least a question of fact about what level of authority she held in the company hierarchy, as well as about whether her actions—helping Events Manager submit an invoice request through company software—are the sort of actions that would constitute ratification.

¶45 Marketing Director's knowledge and actions are potentially helpful for Stein, but even these are not sufficient to indicate ratification as a matter of law. As noted above, *see supra* ¶ 28, there exists a factual question as to what authority Marketing Director had within the company—that is, whether she was high enough up in the company hierarchy to be able to confer authority on Events Manager to sign the contracts or to ratify them after the fact. Moreover, Marketing Director testified that she did not know of the existence of the signed contracts until receiving Stein's "demand for payment," an apparent reference to Stein's May 13 email. At that point, she informed CFO and CMO that Events Manager had actually signed the contracts, and from that point forward MX took no actions that could constitute ratification—indeed, after May 13, MX took the position, in all its dealings with Stein, that the contracts were invalid.

¶46 Next, the district court listed certain actions taken by Events Manager, Events Coordinator, and other lower-level company employees geared toward preparation for the August conference. In particular, the court noted that Events Manager and Events Coordinator visited Stein in April for a site visit, a "creative director" called Stein to request video footage of the property for MX's marketing efforts, and MX updated its website and sent internal emails discussing the event. These are all helpful facts for Stein, but they fall short of establishing ratification as a matter of law. As MX correctly points out, while these actions certainly show that MX employees were "planning for a possible *event*," they do not necessarily compel the conclusion that MX employees were ratifying the terms of specific contracts. Any such conclusion requires certain inferences to be drawn, and those kinds of inferences will need to be made, if at all, by a factfinder.

¶47 Finally, the district court noted that MX, through its CMO, signed an actual contract with a keynote speaker for the

conference. This is another helpful fact for Stein, but it too is subject to competing inferences. CMO apparently did not know about the existence of the contracts until Stein demanded payment, and he testified that the company's planning and marketing efforts, including internal emails and other actions, were merely preparatory for a possible conference. Even Stein appears to acknowledge that this fact—as with many of the facts it advances in support of its ratification argument—is subject to a credibility determination, asserting that "[i]t is impossible to believe that MX could have contractually bound itself to have [a keynote speaker] speak at [Stein] if MX did not know that it had contracts with [Stein] for the conference." This may be an excellent point to make to a factfinder, but for present purposes it is not quite enough. We cannot say that contracting for a keynote speaker necessarily compels the conclusion, as a matter of law, that MX ratified the Stein contracts Events Manager signed.

¶48    Thus, the facts relied upon by Stein and the district court in support of the court's ratification conclusion are either irrelevant to the ratification question or are, to one degree or another, disputed by MX based on other evidence in the record. Even taken together, these facts are not sufficient to support a conclusion that, as a matter of law, MX ratified the Stein contracts. *See Best v. Daimler Chrysler Corp.*, 2006 UT App 304, ¶ 10, 141 P.3d 624 ("It is not the purpose of the summary judgment procedure to judge the credibility . . . of the parties, or witnesses, or the weight of the evidence, and it only takes one sworn statement under oath to dispute the averments on the other side of the controversy and create an issue of fact." (quotation simplified)). We certainly acknowledge the strength of Stein's arguments, but remain convinced that disputed factual issues remain, and that a factfinder, in resolving those disputes, could reasonably conclude that MX did not ratify the contracts.

¶49 Accordingly, because disputed factual issues prevent summary judgment in Stein's favor on issues related to authority and ratification, the district court's decision to grant Stein's motion for summary judgment as to liability was erroneous. We therefore vacate that portion of the district court's summary judgment order, and remand the case for further proceedings consistent with this opinion.

## II. The Liquidated Damages Provisions

¶50 Our conclusion to vacate part of the district court's summary judgment order and remand for further proceedings is technically dispositive of this appeal. The other two fully briefed issues both concern the amount of damages to which Stein would potentially be entitled in the event it prevails at trial on issues related to contractual validity; these damages issues will be moot if MX were to prevail at trial on the contractual validity issues. However, in the event Stein prevails at trial on those issues, the damages issues will become relevant, and therefore we proceed to examine those issues, which stand before us fully briefed and submitted. *See Bair v. Axiom Design, LLC*, 2001 UT 20, ¶ 22, 20 P.3d 388 (proceeding to decide certain submitted issues, even though "resolution of [another] issue" had been "dispositive" of the appeal, because "where an appellate court finds that it is necessary to remand a case for further proceedings, it has the duty of passing on matters which may then become material" (quotation simplified)), *abrogated on other grounds by A.S. v. R.S.*, 2017 UT 77, 416 P.3d 465; *see also Equine Holdings LLC v. Auburn Woods LLC*, 2021 UT App 14, ¶ 36, 482 P.3d 880 (continuing to discuss other issues, "in the hope that such discussion might be useful on remand," despite reversing a summary judgment order and remanding for other reasons).

¶51 The first damages issue concerns whether the liquidated damages provisions in the Stein contracts are unconscionable as a matter of law and therefore unenforceable. Stein sought

summary judgment on that point below, and the district court granted that motion, concluding that the liquidated damages provisions were neither procedurally nor substantively unconscionable. MX appeals that decision, but we affirm it, concluding that the court appropriately analyzed the matter.

¶52 Nearly a decade ago, our supreme court clarified Utah law regarding the enforcement of liquidated damages clauses. In *Commercial Real Estate Investment, LC v. Comcast of Utah II, Inc.*, 2012 UT 49, 285 P.3d 1193, the court held that liquidated damages provisions "should be reviewed in the same manner as other contractual provisions," and are "not subject to any form of heightened judicial scrutiny." *Id.* ¶¶ 38, 40. In other words, parties who wish to challenge a liquidated damages provision must avail themselves of standard contractual concepts like "mistake, fraud, duress, or unconscionability."[5] *Id.* ¶ 40. In

---

5. MX resists this reading of *Commercial Real Estate Investment, LC v. Comcast of Utah II, Inc.*, 2012 UT 49, 285 P.3d 1193, and asserts that liquidated damages provisions can still be invalidated on grounds that they constitute an impermissible "penalty." In *Commercial Real Estate*, the court disavowed a line of cases that had focused "on whether a contractual provision providing for liquidated damages constitutes a penalty," referring to those cases as having imposed "an unnecessary additional check on the enforceability of" liquidated damages provisions. *See id.* ¶¶ 22–23, 33–40. In doing so, however, it noted that most of the "penalty" cases had deemed the liquidated damages clauses unconscionable in any event, and on that basis stated that "[r]eviewing liquidated damages clauses for unconscionability still preserves challenges to penalty clauses." *Id.* ¶ 39. The court also noted that the penalty cases had engaged in essentially "the same inquiry we engage in for claims of unconscionability." *Id.* After *Commercial Real Estate*, as we understand it, liquidated

(continued…)

attacking the liquidated damages provisions found in the Stein contracts, MX invokes the doctrine of unconscionability, a doctrine that presents only legal issues for the court (rather than factual issues for a jury). *See Sosa v. Paulos*, 924 P.2d 357, 360 (Utah 1996) (stating that "[t]he determination of whether a contract is unconscionable is . . . a question of law for the court" to decide).

¶53    MX, as the party claiming that a contractual provision is unconscionable, "bears a heavy burden." *See Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 402 (Utah 1998); *see also Resource Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1043 (Utah 1985) ("A duly executed written contract should be overturned [on unconscionability grounds] only by clear and convincing evidence."). "In determining whether a contract is unconscionable, we use a two-pronged analysis." *Commercial Real Estate*, 2012 UT 49, ¶ 42 (quotation simplified). One prong, geared toward assessment of "procedural unconscionability[,] focuses on the negotiation of the contract and the circumstances of the parties." *Id.* ¶ 43 (quotation simplified). The other prong, geared toward assessment of "substantive unconscionability[,] focuses on the contents of an agreement, examining the relative fairness of the obligations assumed." *Id.* ¶ 44 (quotation simplified). A determination that an agreement is substantively

---

(…continued)

damages provisions that previously were deemed "penalty" clauses will often still be invalidated, but this will occur because those clauses will also usually meet the criteria for unconscionability. Put simply, now that our supreme court has eliminated the "conflicting approaches" to assessing the validity of liquidated damages provisions, there no longer exist valid separate criteria—other than unconscionability standards—to screen for "penalty" clauses. *See id.* ¶¶ 21, 33–40.

unconscionable may, by itself, "support a finding of unconscionability." *Id.* ¶ 42 (quotation simplified).

A. Procedural Unconscionability

¶54 In assessing whether an agreement is procedurally unconscionable, "the key inquiry is whether there was overreaching by a contracting party occupying an unfairly superior bargaining position." *Id.* ¶ 43 (quotation simplified). To assist with this inquiry, our supreme court has set forth a non-exhaustive list of six factors that may "bear[] on procedural unconscionability." *See Ryan*, 972 P.2d at 403. These factors are:

> (1) whether each party had a reasonable opportunity to understand the terms and conditions of the agreement; (2) whether there was a lack of opportunity for meaningful negotiation; (3) whether the agreement was printed on a duplicate or boilerplate form drafted solely by the party in the strongest bargaining position; (4) whether the terms of the agreement were explained to the weaker party; (5) whether the aggrieved party had a meaningful choice or instead felt compelled to accept the terms of the agreement; and (6) whether the stronger party employed deceptive practices to obscure key contractual provisions.

*Id.* (quotation simplified).

¶55 Applying these factors, we readily conclude that the liquidated damages provisions in the Stein contracts are not procedurally unconscionable. Frankly, none of the six factors point toward procedural unconscionability in this case. Both contracting parties are sophisticated corporate entities with

experience negotiating these kinds of contracts.[6] MX had a reasonable opportunity to understand the terms and conditions of the contracts; after all, MX was in possession of the drafts for over two weeks after Events Manager told Stein that MX would need some time to review the contracts "and have [its] legal team also glance over [them]" before they could be executed. MX also had an opportunity for meaningful negotiation; Events Manager had pre-contract discussions with Stein about specific contract terms, including dates, number of rooms, deposits and liquidated damages. Even though the contracts were drafted by Stein using a form template, Stein indicated a willingness to negotiate the terms. And finally, MX certainly had a meaningful choice about whether to stage its conference at Stein, as opposed to elsewhere, and there is no indication that Stein was deceptive about the presence of liquidated damages provisions in the contracts.[7]

---

6. This statement assumes that questions regarding Events Manager's authority will be decided in favor of Stein. Indeed, this entire section of our opinion, as noted above, becomes relevant only if Stein prevails on the contractual validity questions at trial. In that event, it will have been established that Events Manager was authorized to sign the contracts or that MX ratified them post-execution, and Events Manager's own relative inexperience or lack of sophistication will no longer matter. If MX—unquestionably a sophisticated company—chooses a relatively inexperienced representative to negotiate and sign a contract, that choice cannot operate to transform MX from a sophisticated company into something else.

7. Stein's statement that it would "be flexible with" and would "work with" MX regarding Stein's "cancellation and payment policies" does not appear to have been false; indeed, Stein *was*

(continued…)

¶56 The best MX can do is point to the fact that Events Manager was twenty-four years old and relatively new to the job, and that Stein told her that other parties were interested in the same dates for their events and that the contracts needed to be signed soon to secure the desired dates. Aside from being somewhat paternalistic—after all, twenty-four-year-olds are adults, and many of them are capable of accomplishing difficult and complex tasks—this argument describes nothing more than the ordinary apprehension inherent in the negotiation and consummation of almost any commercial transaction. On these facts, MX falls well short of being able to establish procedural unconscionability.

B.      Substantive Unconscionability

¶57 Next, we consider whether the liquidated damages provisions are substantively unconscionable. In making that assessment, we consider "whether there exists an overall imbalance in the obligations and rights imposed by the bargain

_____

(…continued)

flexible with some of those policies, agreeing to allow MX to postpone payment of a $75,000 deposit for more than two months later than the contracts called for. Moreover, those comments were made in the context of a general discussion about Stein's deposit, cancellation, and payment policies, and not in the context of a specific discussion about liquidated damages; in the absence of a more direct connection to the liquidated damages provisions, we do not believe that a later decision to enforce those provisions renders deceptive an earlier general commitment to "work with" MX. And in any event, even if we were to perceive some level of deception in Stein's comments, such deception would not outweigh the other five factors of the procedural unconscionability test, all of which point in the other direction.

according to the mores and business practices of the time and place." *Ryan*, 972 P.2d at 402 (quotation simplified). However, a contract whose terms are clearly better for one side than the other is not necessarily unconscionable; indeed, parties are generally free to negotiate the terms of their own contracts, including unfavorable ones. *See id.* ("Even if a contract term is unreasonable or more advantageous to one party, the contract, without more, is not unconscionable. . . ."); *see also Park Valley Corp. v. Bagley*, 635 P.2d 65, 67 (Utah 1981) (stating that "sellers and buyers should be able to contract on their own terms without the indulgence of paternalism by the courts in the alleviation of one side or another from the effects of a poor bargain," and that parties "should be permitted to enter into contracts that may actually be unreasonable or which may lead to hardship on one side"). In short, substantive unconscionability is present only where the terms of the contract are "so one-sided as to oppress an innocent party." *Ryan*, 972 P.2d at 402 (quotation simplified). That is not the case here.

¶58   MX's chief argument to the contrary is that the liquidated damages provisions were "purposely designed" to create a "massive windfall" for Stein. In particular, MX asserts that these provisions were set up to allow Stein to recover a sum of liquidated damages greater—in two specific ways—than its actual damages. First, MX asserts that, under these provisions, Stein reserved for itself the ability to recover an amount of liquidated damages that could, and would here, far exceed its actual lost profits. Second, and relatedly, MX laments that the liquidated damages provisions do not require Stein to mitigate its damages. Without question, the liquidated damages provisions in these contracts are favorable to Stein and would in this case—if applied—allow Stein to recover an amount of damages that is more than twice as high as its actual

damages.[8] But for the reasons discussed, these provisions are not substantively unconscionable.

¶59 First, the fact that the liquidated damages provisions may allow Stein to recover an amount greater than its actual lost profits does not necessarily render the provisions unconscionable. After all, "the purpose of a liquidated damages provision is to obviate the need for the nonbreaching party to prove actual damages." *Commercial Real Estate Inv., LC v. Comcast of Utah II, Inc.*, 2012 UT 49, ¶ 41, 285 P.3d 1193 (quotation simplified). Liquidated damages provisions are often used by parties in situations "where the damages are likely to be uncertain and not easily proven." *See* 22 Am. Jur. 2d *Damages* § 506. The relationship between potential liquidated damages and estimated actual damages, as measured at the time of contracting, is certainly a factor courts may consider when assessing the unconscionability of a liquidated damages provision. *See Commercial Real Estate*, 2012 UT 49, ¶ 45 (examining, among other things, whether "the contractual amount of liquidated damages" was "unreasonable as compensation for breach" of the contract); *see also* 22 Am. Jur. 2d *Damages* § 528 (stating that courts may consider "whether the amount stipulated is reasonably proportionate or bears a rational relationship to the damages that have actually been caused by the breach"). But a liquidated damages clause is not unconscionable simply because it may allow, if developments play out a certain way, for recovery of an amount of damages

---

8. In this case, because MX cancelled the contracts a full sixty days prior to the date the conference was scheduled to begin, Stein was able to mitigate some of its damages. For purposes of the dueling summary judgment motions, it was undisputed that Stein's actual damages were just over $170,000, approximately half of the roughly $350,000 liquidated damages award.

greater than a party's actual damages. *See Commercial Real Estate*, 2012 UT 49, ¶ 45 (rejecting the argument that a liquidated damages provision was unconscionable because it allowed for recovery of an amount allegedly "grossly disproportionate" to actual damages, and stating that "this type of post-hoc weighing does not bear on the question of substantive unconscionability, which focuses on the relative fairness of the obligations assumed at the time of contracting" (quotation simplified)).

¶60 In this case, the liquidated damages figure is not pulled out of thin air; it is specifically tied to the amount MX was obligated to pay under the contracts, with the percentage varying according to the date of cancellation. That amount is the sum of the room charges, the food charges, and a service fee, amounts that are relatively easy to compute. Stein correctly points out that this amount does not include all the profit centers associated with a full hotel, and specifically excludes profits anticipated from the provision of ancillary services, including things like gift shops, coffee stations, sandwich shops, bars, and equipment rental facilities. These ancillary profits are more difficult to compute, and Stein asserts that its liquidated damages figure—by including full room costs and food charges but excluding ancillary charges—is meant to be a rough but by no means precise prediction of its total lost profits. We agree with Stein that, on this record, its liquidated damages figure bears a reasonable relationship to its estimated potential lost profits.

¶61 Moreover, as applicable here, Stein is entitled to recover, as liquidated damages, 100% of that total if the contracts are cancelled sixty or fewer days before the conference. The parties' respective experts, though they disagree on many things, both agree that using a sixty-day window for "cancellation provisions on the highest scale" is appropriate and common in the

industry.[9] And once this fact is acknowledged, it becomes evident that these particular liquidated damages provisions cannot have been designed, from the outset,[10] to necessarily create a windfall for Stein in every instance.

¶62   At the time the contracts were signed, neither party knew whether the contracts would ever be cancelled, and certainly did not know *when* any such cancellation would take place. Generally speaking, the earlier a cancellation occurs, the better equipped a hotel will be to manage its costs—for instance, by not purchasing food or employing staff for meals that will not be served, or not employing staff to manage rooms that will not be occupied—and to rent the rooms to someone else. If a party cancels on Day 60 (as MX did here), Stein will generally be (and was here) well-positioned to end up in a "windfall" position, in which it is able to utilize the advance notice to manage its costs, and in which it receives (from MX) 100% of the amount MX

---

9. Indeed, the Sundance contract signed by Events Manager contained a liquidated damages provision that—although in other material respects is less onerous than the ones in the Stein contracts—also used a sixty-day window for cancellation purposes and specified that a cancellation within that window would result in the highest amount of liquidated damages.

10. The propriety of liquidated damages provisions must be assessed at the time of contract formation, and not at the time of breach. *See Commercial Real Estate*, 2012 UT 49, ¶¶ 35–36 (criticizing certain approaches to assessing liquidated damages provisions as faulty because they "tended to evaluate the enforceability" of such provisions "with the benefit of hindsight, rather than as of the time of contract formation"); *see also id.* ¶ 52 (Lee, J., concurring) (agreeing with the majority that "post-hoc review" of liquidated damages provisions "is problematic").

agreed to pay, plus additional revenue (from other customers) related to its re-letting of the rooms. But if a party cancels on Day 1—the day before the conference—Stein will be poorly positioned to avoid incurring unnecessary costs or to recoup its losses by re-letting the rooms. Under these circumstances, it is certainly not evident that the liquidated damages provisions in the Stein contracts will always result in a windfall for Stein.

¶63   Second, with regard to mitigation of damages, the general rule is that mitigation is not required in situations where the parties have agreed to a stipulated amount of damages. *See* 24 Williston on Contracts § 65:31 (4th ed. 2020) (explaining that because a liquidated damages provision substitutes a predetermined amount for actual damages, "the existence of an enforceable liquidated damages provision has the effect of making the mitigation of damages irrelevant"); *see also* 22 Am. Jur. 2d *Damages* § 541 ("If a liquidated damages clause is valid, the nonbreaching party does not have a duty to mitigate damages following breach.").[11] MX asserts, as part of its argument, that the liquidated damages provisions are unconscionable precisely because they allow Stein to recover 100% of the room and food costs without any duty to mitigate.

---

11. Our supreme court's decision in *Commercial Real Estate* is not to the contrary. *See* 2012 UT 49, ¶¶ 46–48. Although the court did include in its opinion a discussion of the duty to mitigate damages, it did so only because, in that particular case, the parties had agreed—by contract—to a mitigation-of-damages clause *in addition to* their liquidated damages clause. *Id.* ¶ 5. Certainly, parties are free to vary the general rule—that mitigation of damages is not required where a valid liquidated damages provision exists—by including in their contract, along with a liquidated damages provision, a clause requiring mitigation of damages. In this case, the parties did not do so.

But this can't be right: in the liquidated damages context, parties generally do not have a duty to mitigate. If a liquidated damages provision were considered unconscionable simply because it relieved a party of its duty to mitigate, many liquidated damages provisions would be invalid. Accordingly, we conclude that a liquidated damages provision is not unconscionable merely because that provision allows a party to recover more in damages than it would have if it were subject to a duty to mitigate.

¶64    Without doubt, these liquidated damages provisions are advantageous for Stein. They allow Stein to recover 100% of the room and food charges, without accounting for unincurred costs, and without the necessity of mitigating damages, if the contracts are cancelled inside sixty days prior to the conference date. In many situations, depending on when the cancellation occurs, such liquidated damages provisions will allow Stein to recover more than its actual lost profits. But that fact does not render these provisions substantively unconscionable. The liquidated damages amounts are directly linked to the contractual room and food charges, and are based on a sixty-day cancellation window that is apparently standard in the industry. Under the circumstances presented here, the liquidated damages provisions are not "so one-sided as to oppress or unfairly surprise" MX. *See Commercial Real Estate*, 2012 UT 49, ¶ 44. Accordingly, we affirm that portion of the district court's summary judgment order in which it concluded that the liquidated damages provisions in the Stein contracts were valid and enforceable.

### III. The Date of Cancellation

¶65    Finally, we address the parties' dispute regarding the date on which MX cancelled the contracts. This dispute matters, because under the terms of the contracts, Stein is entitled to liquidated damages equal to 90% of the contracted amounts if

cancellation occurred between sixty-one and ninety days prior to the event, but is entitled to 100% of the contracted amounts if cancellation occurred sixty or fewer days prior to the event. MX contends that it officially cancelled the contracts on May 25 (sixty-eight days prior to the event), when CFO sent an email to Stein offering two potential compromises in an apparent effort to resolve the parties' dispute. Stein contends that the May 25 email was an attempt to renegotiate, not a cancellation, and that the actual cancellation did not occur until June 2, exactly sixty days prior to the event. The district court made no explicit ruling on the matter, but resolved the matter impliedly by awarding Stein, as damages, 100% of the contracted amounts. MX takes issue with that implied decision, contending that questions of fact preclude a resolution of the matter in the summary judgment setting.

¶66 As a general matter, "a notice of termination of cancellation of a contract must be clear and unequivocal." *Glenn v. Reese*, 2009 UT 80, ¶ 19, 225 P.3d 185. Stein asserts that the May 25 email was not clearly and unequivocally a cancellation, and that summary judgment in its favor on the issue is therefore appropriate. Stein's interpretation of the email is certainly a reasonable one, given that CFO never actually said that MX was terminating any contractual relationship between the parties, and even used the email as an attempt to negotiate the terms of a future contractual relationship. Indeed, CFO stated that "[a]lthough the contract was executed by an employee who is not authorized," he understood that "one of our employees has set expectations" with Stein and that he "want[ed] to reach an equitable resolution." Even MX does not assert that Stein's interpretation of the email is unreasonable.

¶67 Instead, it asserts that it can proffer a reasonable alternative interpretation of the email, and that under its interpretation, the email represents a cancellation of the contracts. In particular, MX points to CFO's description of the

contracts as having been executed by an employee without authorization to sign such contracts, and who had not been given authority to sign these specific contracts. It asserts that CFO therefore at least implied that the contracts were unenforceable. It thus contends that its interpretation is a reasonable one, that "a reasonable juror could have concluded" that the email "constituted 'cancellation'" of the contracts, and that the email is therefore ambiguous on that point.

¶68    We agree with MX that its interpretation of the May 25 email is a reasonable one, and agree that this fact renders the email ambiguous. *See Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 24, 367 P.3d 994 (stating that ambiguity exists where a document's "terms are capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies" (quotation simplified)). In many instances, a court's legal determination that ambiguity exists will lead to the conclusion that summary judgment cannot be granted regarding the meaning of a document, and that a factfinder will need to weigh in on the matter. *See, e.g., Ocean 18 LLC v. Overage Refund Specialists LLC* (*In re Excess Proceeds from Foreclosure of 1107 Snowberry St.*), 2020 UT App 54, ¶ 29, 474 P.3d 481 ("If a court determines, as a legal matter, that a contract is ambiguous, then a question of fact exists as to the parties' intentions."). But in this particular context, our determination that the email is ambiguous does not carry the day for MX.

¶69    There are some areas of the law in which clarity is so important that ambiguity itself results in judgment as a matter of law in one side's favor. *See, e.g., Geisdorf v. Doughty*, 972 P.2d 67, 70 (Utah 1998) (stating that when an "optionee decides to exercise his option [to renew a contract] he must act unconditionally and precisely according to the terms of the option," and that actions constituting mere substantial compliance—as opposed to strict compliance—will not suffice

(quotation simplified)); *Brady v. Park*, 2013 UT App 97, ¶¶ 17–20, 302 P.2d 1220 (noting that compound interest "is not favored by the law" and that such interest will be awarded only where the parties "expressly agreed to compound interest," and holding that an agreement that was unclear and left the matter to "inference and implication" had to be construed as providing for simple interest). Our supreme court has declared cancellation of contracts to be one of those areas. *See Glenn*, 2009 UT 80, ¶ 19 ("Ambiguous conduct and language intended to signal contract termination will be deemed not to have terminated the contract." (quotation simplified)). In this specific context, a communication that only ambiguously communicates intent to cancel a contract will be deemed, as a matter of law, insufficient to cancel that contract. "[N]otice of termination or cancellation of a contract must be clear and unequivocal," and if it isn't, it doesn't operate to cancel the contract. *Id.* In particular, a communication that "commingl[es] . . . a wish to cancel with a desire to negotiate and save the contract cannot be seen as an unequivocal notice of cancellation." *Id.* ¶ 20.

¶70 The May 25 email is ambiguous. It might have been an attempt to cancel any contractual relationship the parties might have had,[12] and can even be reasonably so interpreted, but it

---

12. We recognize that MX's position, both in the May 25 email and throughout this litigation, is that no valid contracts ever existed between MX and Stein. But we have determined, *see supra* Part I, that questions of fact remain to be adjudicated on this point. Of course, if the factfinder later determines that no contracts existed, then cancellation was never necessary, Stein will not be entitled to contractual damages, and this issue will be rendered moot. But if the factfinder sides with Stein, and determines that valid contracts were in effect as of May 25, the date of cancellation of the contract will become relevant to the

(continued…)

does not clearly and unequivocally set forth that intention. In this specific area of the law, ambiguity is not sufficient to stave off summary judgment. Because the May 25 email was ambiguous, and did not serve as a clear and unequivocal cancellation of the contracts, the district court correctly (if impliedly) determined that, as a matter of law, MX cancelled the contracts on June 2, just sixty days before the conference was to begin. Thus, in the event that Stein prevails on the contractual validity issues, it will be entitled to 100% of the contractual amount as liquidated damages.

CONCLUSION

¶71    The presence of disputed factual issues prevents entry of summary judgment in Stein's favor on issues related to validity of the contracts. In particular, a reasonable factfinder could conclude, on this record, that Events Manager did not have actual or apparent authority to sign the contracts, and that MX did not ratify them after the fact. Thus, the part of the district court's summary judgment order granting Stein's motion for summary judgment as to liability is erroneous. We vacate that portion of the order, and remand for further proceedings.

_____

(…continued)

damages inquiry. We acknowledge MX's point that it is not obligated to cancel contracts that did not exist, but a party who puts all its eggs in the contractual-nonexistence basket takes a risk that a factfinder may later disagree with it on that point. A prudent party in MX's position would be well-advised to craft a notice that both maintains the position that no contract exists but also, in the alternative, clearly and unequivocally cancels any contractual relationship that might later be determined to exist.

¶72    With regard to damages, the court's summary judgment order is correct. The liquidated damages provisions in the contracts are, as a matter of law, not unconscionable, and MX did not clearly and unequivocally cancel the contracts until June 2, just sixty days before the conference was to begin. We therefore affirm the remainder of the court's summary judgment order, and remand with instructions that Stein, if it prevails at trial on the disputed issues regarding contractual validity, will be entitled to recover, as liquidated damages, 100% of the contractual amount.

—————