2025 UT App 5

# THE UTAH COURT OF APPEALS

PIONEER HOME OWNERS ASSOCIATION,
Appellant,
*v.*
TAXHAWK INC. AND VANDELAY PROPERTIES LLC,
Appellees.

Opinion
No. 20230286-CA
Filed January 9, 2025

Fourth District Court, Provo Department
The Honorable Derek P. Pullan
No. 160400808

Douglas P. Farr, Zaven Sargsian, and Jack L.
Darrington, Attorneys for Appellant

Jeffrey J. Hunt, David C. Reymann, Jonathan C.
Williams, Quinn M. Kofford, Troy L. Booher, and
Dick J. Baldwin, Attorneys for Appellees

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
GREGORY K. ORME and MICHELE M. CHRISTIANSEN FORSTER
concurred.

HARRIS, Judge:

¶1 In this case, adjoining landowners are in their ninth year of litigation—and second trip to the appellate courts—in a fight about ownership of a narrow strip of land (the Disputed Strip) running along the boundary between their respective parcels. TaxHawk Inc. and Vandelay Properties LLC (collectively, TaxHawk) are the record owners of the Disputed Strip. But Pioneer Home Owners Association (the HOA) claims ownership through the common-law doctrine of boundary by acquiescence. As the HOA sees it, its predecessor-in-interest fulfilled the requirements of the common-law doctrine, and later quit-claimed

its interest in the Disputed Strip to the HOA. The narrow question presented by this appeal is whether the now-deceased corporate president of the HOA's predecessor-in-interest had authority to execute the quit-claim deed that forms the basis for the HOA's claim of ownership.

¶2     On that issue, the district court entered summary judgment in favor of TaxHawk, determining as a matter of law that the corporate president of the HOA's predecessor-in-interest had no authority to execute the quit-claim deed. The HOA appeals the court's summary judgment order, asserting that genuine issues of material fact exist that preclude summary judgment and that necessitate a trial in front of a factfinder. For the reasons discussed, we agree with the HOA, at least in part, and we therefore reverse the district court's summary judgment order and remand the case for further proceedings.

BACKGROUND[1]

*The Pioneer Drive-In*

¶3     For decades, the Cox family operated a drive-in movie theater—the Pioneer Drive-In (the Drive-In)—along south State Street in Provo, Utah. The family created a corporate entity— Pioneer Drive-In Theaters Inc. (the Drive-In Company)—through which it managed the Drive-In and its associated business. The Drive-In Company is the predecessor-in-interest to the HOA.

¶4     The property on which the Drive-In was located shares a boundary with the parcels currently owned by TaxHawk. According to members of the Cox family, there was originally "a

---

1. "When reviewing a grant of summary judgment, we view the facts in the light most favorable to the losing party below," and we recite the facts accordingly. *Turley v. Childs*, 2022 UT App 85, n.1, 515 P.3d 942 (quotation simplified).

cedar post fence" between the Drive-In property and the TaxHawk property, but over time, the Cox family gradually replaced it with a chain-link fence because the old fence was not effective enough in deterring people from sneaking into the Drive-In. There was also a ditch running parallel to the fence line, which the Cox family used for irrigation purposes. Additionally, the Cox family planted trees along one side of the ditch. Many family members—including specifically the patriarch of the family, Marvin Cox, and his son Steven Cox—believed that the fence was the boundary between the parcels. Evidence that the Drive-In Company "used the property . . . all the way up to the [f]ence" was provided not only by members of the Cox family but also by neighbors who grew up nearby. But although evidence exists indicating that all relevant property owners had treated the fence as the property boundary for decades, the fence does not sit on the actual record boundary: as it turns out, the fence is located several feet over onto the TaxHawk side of the record boundary line. The area between the record boundary line and the fence line constitutes the Disputed Strip.

¶5   During his lifetime, Marvin managed the Drive-In and more or less ran the Drive-In Company, with increasing assistance, as the years passed, from Steven. Marvin died in 2000, and after that, Steven became president of the Drive-In Company. In 2001, under Steven's leadership, the Drive-In ceased operation, but the Drive-In Company remained intact, largely so that it could manage the property it still owned, including the parcel on which the Drive-In had operated.

¶6   During this time, soon after Marvin's death, the other members of the Cox family generally left management of the Drive-In Company to Steven. Marvin's wife, Jeanine Cox, testified at a deposition that Steven "took over the management" of the Drive-In Company at that point, that he "stepped into the shoes of Marv[in]," and that he handled "anything financially." Steven's surviving siblings—his sisters Debra and Peggy, and his brother

David—all confirmed that, after Marvin's death, they were not involved in the management of the Drive-In Company and that it was Steven who "took over the management" of the company's affairs. In fact, Peggy testified that "we didn't even know what [Steven] was doing behind our back, which is okay. We . . . didn't care about it . . . . We just let Steven run everything and he did." It is unclear, from the record submitted to us, whether the Drive-In Company had a functioning board of directors during this time period and, if so, who the board members were; Jeanine testified that she doesn't remember the company ever holding a single formal business meeting. But it is in any event clear that, during this time, Steven was managing the company's affairs and that he rarely asked the family members for their "opinion or . . . approval on anything," although he would sometimes casually "talk about things" with them "at the dinner table."

¶7     In mid-2001, Steven, on behalf of the Drive-In Company, executed six different contracts—referred to by the parties as "boundary-line agreements"—resolving a series of boundary disputes between the company and some of its neighbors. These agreements included language indicating an intent to transfer property, namely, that the parties "agree on and place their common boundary line . . . as described" and that they "mutually quit-claim to each other all property lying on the respective side of the described boundary line." Steven's signature on these agreements was notarized, and the notary averred that Steven was "known to be the . . . authorized agent for the" Drive-In Company and that Steven had "acknowledged" that he had the "authority of [the Drive-In Company's] bylaws or by resolution of its Board of Directors . . . to execute[] the instrument." Other than the notary's certification that appears on the face of the agreements, there is no evidence in the record that anyone else in the Cox family was aware of or otherwise approved the boundary-line agreements. But TaxHawk does not contend, in this litigation, that Steven lacked authority to execute the boundary-line agreements on behalf of the Drive-In Company.

¶8 Also in 2001, the Drive-In Company was looking for a buyer to purchase its main parcel of land, the one on which the now-shuttered Drive-In had been located. On *this* transaction—as opposed to the less-significant boundary-line agreements—Steven apparently kept the rest of the family in the loop, and he would "talk to [the siblings] whenever [they] were together" and consult with them about his meetings with interested potential buyers. Eventually, in August 2001, the Drive-In Company sold the main parcel to a developer (Developer). The legal description of the property conveyed to Developer does not include the Disputed Strip, even though Steven (and Marvin, before his death) apparently believed that the relevant Drive-In property went all the way to the fence line. The parcel was conveyed to Developer via a warranty deed, which Steven signed on behalf of the Drive-In Company. The notary who acknowledged Steven's signature also certified—similar to the certifications on the boundary-line agreements—that Steven stated that he was "the president" of the Drive-In Company and that he had signed the deed "by authority of a resolution of [the Drive-In Company's] board of directors." In addition, the body of the deed proclaims, above Steven's signature, that "[t]he officers who sign this deed hereby certify that this deed and the transfer represented thereby was duly authorized under a resolution duly adopted by the board of directors of the [Drive-In Company] at [a] lawful meeting duly held and attended by a quorum." The record submitted to us does not include a copy of any such resolution, nor does it include any other evidence that any such board meeting was ever held by the Drive-In Company. However, no party to this case disputes the basic proclamation contained on the face of the deed, namely, that Steven had authority to execute the warranty deed conveying the main parcel to Developer.

¶9 In the years that followed, Developer took steps to develop the Drive-In property, creating residential parcels and selling those to individual homeowners. During the time it owned the property, Developer occupied the Disputed Strip by installing sod

and sprinklers up to the fence. Developer's project was eventually governed by a homeowners association—the HOA—and in 2007, Developer quitclaimed to the HOA all of the "open space and common area" of the development. Over the next decade or so, the HOA used and occupied the property, including the Disputed Strip, all the way up to the fence, and did so by "watering, mowing, and fertilizing the grass, trimming the trees, maintaining the sprinklers, and cleaning up leaves and any other debris from the property."

*The First Suit and the Quit-Claim Deed*

¶10    The situation changed in 2016, when TaxHawk made it known that it would like to destroy the fence and cut down the trees on the Disputed Strip. The HOA responded by filing a lawsuit against TaxHawk, asserting that the HOA owned the Disputed Strip by virtue of the legal doctrine of boundary by acquiescence; in the lawsuit, the HOA asked the district court to issue a judgment quieting title to the Disputed Strip in its favor. The court dismissed the HOA's claims, however, because it determined that, even if it were to assume that the Drive-In Company acquired the Disputed Strip via boundary by acquiescence, there was no evidence that the Drive-In Company had ever conveyed its interest in the Disputed Strip to the HOA.

¶11    In the wake of the district court's summary judgment ruling, the HOA approached Steven, who was apparently still the corporate president of the Drive-In Company, and asked if the company would sign a quit-claim deed conveying to the HOA its interest, if any, in the Disputed Strip. As in the 2000–2001 time frame, the Drive-In Company during this later time period was still managed almost exclusively by Steven. Indeed, the other three siblings all acknowledge that they were not involved in company management during this time, and that David did not become involved until after Steven's death in 2019. As for the board of directors, the HOA takes the position that there was no

functioning board of directors during this time period. TaxHawk's position is that the board during these years consisted of David, Steven, Jeanine, Peggy, and Debra. Our examination of the record leads us to conclude that it is not clear enough for the facts on this point to be considered established for summary judgment purposes.[2]

¶12    At any rate, in March 2017, after some discussion with the HOA, Steven agreed to execute a quit-claim deed (the Quit-Claim Deed) conveying to the HOA any interest the Drive-In Company might have in the Disputed Strip. Steven signed that deed as "President" of the Drive-In Company. Unlike the 2001 deed to Developer, however, the Quit-Claim Deed does not proclaim, on its face, that Steven possessed authority from the Drive-In Company to make that conveyance. And the Quit-Claim Deed's notarization block states simply that Steven signed the document in his "capacity as the President of" the Drive-In Company. The record does not contain a board of directors' resolution or any other authorization from the Drive-In Company to Steven specifically authorizing him to sign the Quit-Claim Deed.

---

2. The HOA asks us to take judicial notice of certain corporate records of the Drive-In Company; these records purportedly show that "the only living members of the Drive-In [Company's] board of directors in 2017 were Steven and his mother, Jeanine." But these records were not presented to the district court and are not part of the appellate record. "We do not consider documents that fall outside the appellate record, no matter how much they might pique our interest." *Montes v. Nat'l Buick GMC, Inc.*, 2024 UT 42, ¶ 39 n.8. And in any event, we decline the HOA's invitation to take judicial notice of such documents. On remand, the parties are certainly entitled to seek the admission of these documents in future proceedings; we offer no opinion as to their admissibility or their persuasive value.

*The Second Suit*

¶13    After obtaining the Quit-Claim Deed, the HOA filed a second lawsuit against TaxHawk, again asking the district court to quiet title to the Disputed Strip in its favor. At TaxHawk's request, the court consolidated the HOA's second suit with the first one, which had remained pending due to the presence of TaxHawk's counterclaims. Later, TaxHawk moved to dismiss the second suit, asserting that the doctrine of claim preclusion barred the HOA from bringing it. The district court granted TaxHawk's motion to dismiss, but—in this case's first trip to the appellate courts—we reversed that decision, concluding that the HOA's acquisition of the Quit-Claim Deed "was a new transaction and that the district court erred by concluding that [the HOA] could or should have acquired" the Quit-Claim Deed from the Drive-In Company during the first lawsuit. *Pioneer Home Owners Ass'n v. TaxHawk Inc.*, 2019 UT App 213, ¶ 40, 457 P.3d 393.

¶14    In 2019, while the case was on appeal the first time, Steven passed away. Before his death, no party had sought to take his deposition. After the case was remanded following the appeal, the parties engaged in the discovery process, including taking the depositions of the living members of the Cox family (siblings David, Peggy, and Debra, and mother Jeanine).

¶15    In the wake of Steven's death, David took over as president of the Drive-In Company, and he took a different approach toward the Disputed Strip than Steven had. Indeed, David stated in his deposition that the company's board—which he believed had been functional at the time—had *not* authorized Steven to sign the Quit-Claim Deed, and that neither he nor any other family member had any knowledge of the company's occupation of the Disputed Strip. And in 2022, under David's leadership, the Drive-In Company's board of directors passed a resolution stating that the company had "no records, authorizations or approvals to indicate that [Steven] was authorized by the Board to" execute the

Quit-Claim Deed, and that "the Board believe[s] that Steven did not have" any such authority.

¶16    But the discovery process also turned up some of Steven's notes, which indicated that both Marvin and Steven believed that the boundary of the property was located at the fence, that the family had maintained the fence and used the ditch, and that Marvin had planted a tree where he thought the boundary of the property was located. Steven's notes also indicate that he had researched the doctrine of boundary by acquiescence. Upon finding this information, David emailed TaxHawk in February 2020 and stated that "we might have to go with the ditch as the property line," to which TaxHawk expressed disappointment that the boundary was "not what we had all thought."

¶17    After completion of discovery, TaxHawk filed a motion for summary judgment, asserting both (a) that the Drive-In Company had never acquired an interest in the Disputed Strip through boundary by acquiescence and (b) that Steven had no authority to sign the Quit-Claim Deed on behalf of the Drive-In Company. The district court was not persuaded by TaxHawk's first argument, concluding that questions of fact remained regarding whether the company had acquired the Disputed Strip through boundary by acquiescence. But the court agreed with TaxHawk on its second argument, concluding as a matter of law that Steven had neither written nor oral authorization from the Drive-In Company to execute the Quit-Claim Deed, and that the Quit-Claim Deed therefore did not operate to convey to the HOA any interest the Drive-In Company might have had in the Disputed Strip.

ISSUE AND STANDARD OF REVIEW

¶18    The HOA now appeals, and it challenges the district court's summary judgment order. We review summary judgment rulings for correctness. *Shree Ganesh, LLC v. Weston Logan, Inc.*, 2021 UT 21, ¶ 11, 491 P.3d 885. Under this standard, we "give no

deference to the district court's legal conclusions and consider whether the court correctly decided that no genuine issue of material fact existed." *Id.* (quotation simplified).

ANALYSIS

¶19 The district court ruled that, as a matter of law, Steven had no authority to execute the Quit-Claim Deed. The HOA challenges this ruling, asserting that—at a minimum—disputed questions of material fact exist with regard to three different pathways by which a factfinder might conclude that Steven had the necessary authority. First, the HOA asserts that a factfinder could reasonably conclude that the actual written authorization the Drive-In Company apparently gave Steven in 2001—to effectuate the sale of the Company's property to Developer— included the authorization to sell the Company's entire parcel, including the Disputed Strip. Second, the HOA asserts that a factfinder could reasonably conclude that the Drive-In Company gave Steven sufficiently broad oral authorization over corporate affairs to fit within an established exception to Utah's statute of frauds. And finally, the HOA asserts that a factfinder could reasonably conclude that Steven had apparent authority to execute the Quit-Claim Deed. We agree with the HOA on the first two of its suggested pathways, but we disagree as to the third.

## I. Actual Authority

¶20 The first pathway the HOA suggests is rooted in the 2001 transaction in which the Drive-In Company conveyed to Developer its main parcel—the one on which the Drive-In had been located and with which the Disputed Strip is related. That conveyance was effectuated with a warranty deed, signed by Steven on behalf of the Drive-In Company. The notary who took Steven's signature certified that Steven had signed the deed "by authority of a resolution of [the Drive-In Company's] board of directors." In addition, the body of the deed proclaims, above

Steven's signature, that "[t]he officers who sign this deed hereby certify that this deed and the transfer represented thereby was duly authorized under a resolution duly adopted by the board of directors of the [Drive-In Company] at [a] lawful meeting duly held and attended by a quorum." The record submitted to us does not include a copy of any such resolution. But TaxHawk does not dispute that Steven was given the authority recited on the deed, including the authority to execute the warranty deed conveying the main parcel to Developer.

¶21   The legal description of the property conveyed to Developer, as recited in the deed, does not include the Disputed Strip. But the HOA contends that a factfinder could readily draw the inference, from the record evidence, that the authority that was undisputedly given to Steven related to this conveyance included authority to convey the Drive-In Company's entire parcel, including the Disputed Strip. We agree.

¶22   Record evidence exists indicating that Steven, at the time of the conveyance to Developer, believed that the relevant parcel—the one on which the Drive-In had been located and the one that was being conveyed to Developer—went all the way to the fence line and included the Disputed Strip. Record evidence exists indicating that Marvin, prior to his death just a year earlier, believed the same thing. And record evidence exists indicating that the Drive-In's neighbors also believed that the Drive-In Company's parcel went all the way to the fence line, because that's how the Drive-In Company was using the parcel.

¶23   Very little, if any, record evidence exists indicating what the other members of the Cox family thought in 2001—when the Drive-In Company undisputedly gave Steven authorization to convey the company's property to Developer—about either the scope of that authorization or about whether the Drive-In Company owned the Disputed Strip. And very little, if any, record evidence exists indicating which other members of the Cox family

were on the Drive-In Company's board of directors at the time, or whether the company—which was apparently not particularly observant of corporate formalities—even had a functioning board of directors. What evidence we *do* have indicates that, as a general matter, the other family members were content to have Steven manage the company's affairs; as noted, Peggy testified that, at the time, "We just let Steven run everything and he did." In our view, it is not an unreasonable inference, from this evidence, that the company's principals—at least at the time—both (a) believed that (or didn't know or care whether) the company owned the Disputed Strip and (b) gave Steven authorization to sell to Developer the company's entire parcel, whatever its precise boundaries were, including whatever interest the company had in the Disputed Strip.

¶24 And in any event, the perspective that matters most here is Steven's, and not necessarily the board's. The question is whether a factfinder could permissibly find, on this record, that Steven— as an agent of the Drive-In Company—had *actual* authority to convey the Disputed Strip along with the company's record-title interests. And in assessing whether an agent possesses actual authority, "we must examine the acts of the principal from the agent's perspective." *See Stein Eriksen Lodge Owners Ass'n Inc. v. MX Techs. Inc.*, 2022 UT App 30, ¶ 26, 508 P.3d 138 (quotation simplified). "At root," the actual-authority inquiry "turns on the reasonableness of the agent's belief that [the agent] possessed sufficient authority." *Id.* And this part of the analysis contains "both an objective and a subjective component: the agent must subjectively hold the belief that [the agent] possesses authority, and that belief must be objectively reasonable in light of the principal's actions." *Id.* The relevant actions of the principal may be direct or indirect: actual authority can be implied (as opposed to express), and "implied authority stems from the words and conduct of the parties and the facts and circumstances attending the transaction in question." *Id.* ¶ 27 (quotation simplified).

¶25    Here, a factfinder could reasonably conclude that Steven had a subjective belief that he had been authorized to convey the Drive-In Company's entire main parcel, whatever its boundaries actually were, including whatever interest the company had in the Disputed Strip. Again, there is evidence suggesting that he thought the relevant parcel included the Disputed Strip, and he could have reasonably thought that was what he was conveying. While such a finding is by no means compelled by the evidence, it would certainly be well within the bounds of reasonableness for a factfinder to so conclude.

¶26    Likewise, a factfinder could reasonably conclude that Steven's belief—that he had been authorized to convey the entire parcel, including the Disputed Strip—was objectively reasonable under the circumstances and in light of the Drive-In Company's actions. The Drive-In Company undisputedly gave Steven authorization to sell the company's main parcel. The company, as well as its neighbors, had apparently been operating on the assumption that the company owned the Disputed Strip. There is no indication that any other member of the Cox family, at the time, took a different view. Again, while such a finding is by no means compelled by the evidentiary record, a factfinder could conclude that Steven's belief was objectively reasonable.

¶27    In sum, a factfinder could conclude that, in 2001 when Steven sold—pursuant to valid authority—what he thought was the entirety of Drive-In Company's main parcel to Developer, he reasonably believed the Disputed Strip to be an authorized part of that sale. And if that is true, then that same factfinder could also reasonably conclude that—after it was later discovered that the conveyance did not in fact include the Disputed Strip—Steven retained actual authority, stemming from the 2001 authorization that he undisputedly received, to quit-claim to the HOA the rest of the property he thought he had already conveyed to the HOA's predecessor-in-interest. As the HOA puts it in its brief, the HOA is entitled, at the summary judgment phase of the litigation, "to

an inference that whatever authorization Steven received from the Drive-In [Company] in 2001 was broad, informal, and included authorization for Steven to convey all of the Drive-In [Company's] property, including the Disputed Strip."

¶28   Because genuine issues of material fact remain to be decided on the issue of actual authority, the district court's summary judgment order was in error on this point.

## II. Oral Authorization Exception to the Statute of Frauds

¶29   The second pathway the HOA suggests is rooted in a common-law exception to Utah's statute of frauds, one that allows an oral authorization from a principal to an agent to be valid under certain circumstances.

¶30   Utah's statute of frauds provides as follows:

> No estate or interest in real property, other than leases for a term not exceeding one year, nor any trust or power over or concerning real property or in any manner relating thereto, shall be created, granted, assigned, surrendered or declared otherwise than by act or operation of law, or by deed or conveyance in writing subscribed by the party creating, granting, assigning, surrendering or declaring the same, *or by that party's lawful agent thereunto authorized by writing*.

Utah Code § 25-5-1 (emphasis added). Thus, Utah's statute of frauds requires that, for an agent to be legally able to convey real property on behalf of a principal, the agent must—generally speaking—have been authorized to do so in writing.

¶31   But there exists an exception to the general rule that an agent needs such an authorization in writing. That exception is applicable when the agent is both (1) "a general agent or executive

officer of the corporation" and (2) "acts under an oral authorization." *See Wasatch Oil & Gas, LLC v. Reott*, 2011 UT App 152, ¶ 4, 263 P.3d 391 (quotation simplified); *accord Mathis v. Madsen*, 261 P.2d 952, 956 (Utah 1953). This so-called "oral authorization exception" was created in recognition of the fact that an "executive officer of a corporation is something more than an agent. He is the representative of the corporation itself." *Mathis*, 261 P.2d at 956 (quotation simplified). As such, allowing general agents or executive officers to convey property on behalf of a company after receiving only oral (but not written) authorization "squares with sound principles and the necessities of modern business." *Id*. (quotation simplified).

¶32   No party disputes that Steven was the Drive-In Company's president and general agent at all relevant times, including in 2017 when he signed the Quit-Claim Deed. So, the issue presented here is whether evidence exists to indicate that Steven was acting "under an oral authorization" from the Drive-In Company when he signed the Quit-Claim Deed.

¶33   On that point, there is likewise no dispute that the record is devoid of evidence that Steven had any *specific* oral authorization from the Drive-In Company to execute the Quit-Claim Deed in 2017. But the HOA asserts that oral authorization sufficient to satisfy the common-law exception need not be as specific as that—it contends that a more general authorization to undertake any conveyance of the company's real property would suffice, and it contends that sufficient evidence exists in this record for the HOA to survive summary judgment on this point.

¶34   TaxHawk, for its part, acknowledged at oral argument before this court that a broad oral authorization from a company to a general agent authorizing that agent to make any and all real estate conveyances on the company's behalf would, in theory, be sufficient to satisfy the common-law exception to the statute of frauds. But it contends that there is insufficient record evidence of

any such broad oral authorization to create a genuine issue of material fact on the point. We disagree.

¶35 We note, at the outset of our analysis, that evidence sufficient to preclude summary judgment need not be extensive, and it need not necessarily be as ample as the evidence on the other side of the ledger. Trials are governed by an "elemental rule" that a factfinder "may believe one witness as against many, or many against one." *See W.W. & W.B. Gardner, Inc. v. Mann*, 680 P.2d 23, 24 (Utah 1984) (quotation simplified); *accord* Model Utah Jury Instructions 2d CV121 (2020), https://legacy.utcourts.gov/muji/?cat=1 [https://perma.cc/Q3DU-885R]. And with this rule in mind, our supreme court has emphasized that a single piece of admissible evidence on one side of the evidentiary ledger can be enough to preclude summary judgment. *See Mann*, 680 P.2d at 24 ("It only takes one sworn statement under oath to dispute the averments on the other side of the controversy and create an issue of fact." (quotation simplified)); *accord Draper City v. Estate of Bernardo*, 888 P.2d 1097, 1101 (Utah 1995); *see also Davis v. Sperry*, 2012 UT App 278, ¶ 22, 288 P.3d 26 ("It is inappropriate for courts to weigh disputed material facts in ruling on a summary judgment, regardless of whether the evidence on one side may appear to be strong or even compelling." (quotation simplified)).

¶36 In this case, while the record evidence in support of the HOA's position on this point is not particularly extensive, in our view sufficient evidence exists to create a factual question about whether, during all relevant times between Marvin's death and his own, Steven had something close to plenary power to handle the Drive-In Company's real-estate-related affairs. For instance, Peggy testified that, after Marvin's death, Steven "took over the management" of the Drive-In Company and that the family "just let Steven run everything." Jeanine likewise testified that, after Marvin's death, Steven "stepped into the shoes of Marv[in]" and "took over the management of" the Drive-In Company; she

specifically indicated that Steven handled "anything financially." And there is additional documentary evidence indicating that the broad grant of authority the family apparently gave Steven extended at least to relatively minor real estate transactions involving boundary-related quit-claim deeds: in 2001, just months before the larger transaction with Developer, Steven executed six different boundary-line agreements resolving a series of boundary disputes between the Drive-In Company and its neighbors. Each such agreement involved a quit-claim conveyance by the Drive-In Company of "all property lying on the respective side of the described boundary line." And as already noted, TaxHawk does not contend, in this litigation, that Steven lacked authority to execute those boundary-line agreements on behalf of the Drive-In Company.

¶37 To be sure, there is record evidence that cuts in the other direction. The boundary-line agreements—unlike the Quit-Claim Deed—contained a notary certification that the Drive-In Company had authorized Steven to sign the agreements. And, of course, the company's board of directors passed a resolution, in 2022, indicating that, in its view, "Steven did not have the power and authority" to execute the Quit-Claim Deed. But where evidence conflicts, a genuine issue of material fact is created that needs to be resolved by the factfinder. Such is the case here.

¶38 Accordingly, the district court erred by resolving this factual issue as a matter of law.

### III. Apparent Authority

¶39 Finally, the HOA asserts that Steven had apparent authority to execute the Quit-Claim Deed in 2017. We disagree with the HOA that sufficient evidence exists on this point to create a triable issue of fact.

¶40 "One key difference between actual and apparent authority is the point of view from which these doctrines are

assessed." *Stein Eriksen Lodge Owners Ass'n Inc. v. MX Techs. Inc.*, 2022 UT App 30, ¶ 31, 508 P.3d 138. Actual authority—as discussed above—"is evaluated from the agent's perspective." *Id.* (quotation simplified). Apparent authority, by contrast, "focuses on the acts of the principal from a third party's perspective." *Id.* (quotation simplified). "Apparent authority exists when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestation." *Id*. ¶ 32 (quotation simplified). Indeed, one of the essential elements that must be shown for apparent authority to exist is that "the *principal* must have manifested his or her consent to the exercise of such authority or have knowingly permitted the agent to assume the exercise of such authority." *Id.* (emphasis added) (quotation simplified); *see also Burdick v. Horner Townsend & Kent, Inc.*, 2015 UT 8, ¶ 21, 345 P.3d 531 (noting that apparent authority exists "where a principal has, by his voluntary act, placed an agent in such a situation that a person of ordinary prudence . . . is justified in presuming that such agent has authority to perform, on behalf of his principal" (quotation simplified)). In this context, "the agent's manifestations to the third party are alone insufficient; that is, the principal must have taken some action, known to the third party, that causes the third party to reasonably believe that the agent had authority." *Stein Eriksen*, 2022 UT App 30, ¶ 32.

¶41     In this case, there is no evidence of any actions taken by the principal—here, the Drive-In Company—that would have been known by or manifest to the third party—here, the HOA—that would have caused the HOA to reasonably believe that Steven had been given authority to execute the Quit-Claim Deed. Any representations or manifestations made to the HOA in connection with the 2017 transaction and upon which the HOA might have relied were made by Steven (the agent) and not by the Drive-In Company (the principal). Indeed, as noted, up until Steven's death the Drive-In Company's board appears to have taken a rather hands-off approach to corporate governance—a fact that

may weigh in the HOA's favor as concerns the first two pathways discussed above. But as to this third pathway, for which evidence of some action or manifestation by the principal is required, the situation is different. As concerns the 2017 Quit-Claim Deed transaction, there is no evidence that the Drive-In Company's board (as distinct from Steven) did anything that was communicated or manifested to the HOA and upon which it might have reasonably relied.

¶42 Accordingly, the district court did not err in granting summary judgment to TaxHawk on the question of whether Steven had apparent authority to execute the Quit-Claim Deed.

CONCLUSION

¶43 We affirm the trial court's summary judgment order regarding apparent authority, the third pathway by which the HOA is attempting to show that Steven had authority to execute the Quit-Claim Deed. But genuine issues of material fact remain to be decided on the other two pathways proffered by the HOA. Specifically, a factfinder should decide, after a trial, whether Steven had actual authority based on the 2001 authorization, and a factfinder should decide, after a trial, whether Steven was given broad enough oral authorization over company affairs generally such that he had authority to execute the Quit-Claim Deed. To this extent, we reverse the district court's summary judgment order, and we remand the case to the trial court for further proceedings.

———————